**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **OWNER OPERATOR** | : | |
| **INDEPENDENT DRIVERS** | : | |
| **ASSOCIATION, INC.,** *et al.*, | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **Case No. 05-00056** |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | **Magistrate Judge Norah McCann King** |
| **COMERICA BANK,** | : | |
| | : | |
| **Defendant.** | : | |

<u>OPINION AND ORDER</u>

## I.  INTRODUCTION

This matter is before the Court on Defendant Comerica Bank's ("Comerica") Motion for

Summary Judgment (doc. no. 54) and Plaintiffs Owner-Operator Independent Drivers

Association's ("OOIDA"), Carl Harp's, and Michael Wiese's (collectively, "Plaintiffs") Motion

for Summary Judgment (doc no. 55).  For the reasons set forth below, the Court **GRANTS**

Comerica's Motion and **DENIES** Plaintiffs' Motion.

## II.  BACKGROUND

### A. FACTUAL BACKGROUND

Plaintiffs seek to enforce the final judgment entered by this Court on July 16, 2004, in

*OOIDA v. Arctic Express, Inc.*, No. 97-750 (the "*Arctic* Litigation"). Harp and Wiese are

"owner-operators" of trucking equipment and OOIDA is an owner-operator industry association

with more than 141,000 members. Arctic Express, Inc. ("Arctic") is a regulated motor carrier

engaged in the business of providing transportation services to the shipping public, and was sued

by Plaintiffs in the Arctic Litigation. Comerica is a bank through which Arctic maintained

several accounts, as well as a revolving line of credit.

## 1. The Arctic Litigation

The Arctic Litigation was filed June 30, 1997, and among other claims, sought the return

of maintenance escrow funds pursuant to the federal Truth-in-Leasing regulations enacted in

1978 for the protection of owner-operator truckers. The escrow provisions of the Truth-in-

Leasing regulations provide specific requirements for the treatment of escrow funds, including

an accounting of transactions related to the funds collected, and the return of escrow balances

within 45 days of the termination of the relationship with the carrier.

Arctic and its equipment leasing affiliate, D&A Associates ("D&A"), entered into

agreements whereby Plaintiffs leased their trucking equipment to Arctic. As part of these

agreements, Arctic deducted nine cents per mile from the compensation owed to each owner-

operator for purposes of repairing and maintaining the leased trucking equipment. Arctic

recorded the amounts in maintenance escrows deducted from owner-operator compensation on

settlement statements issued weekly to owner-operators, and recorded the total in maintenance

contributions accrued to the owner-operators on the settlement statements.

This Court held that these "maintenance escrow funds" were subject to the requirements

of the federal Truth-in-Leasing regulations, 49 C.F.R. § 376.12. This Court found that these

funds were collected for the sole purpose of maintaining the individual owner-operator's leased

equipment prior to the owner-operator's termination of his lease, and these funds were not

available to be used for any other obligation. And pursuant to the Truth-in-Leasing regulations,

Arctic and D&A were required to return to individual owner-operators unused amounts

remaining after termination of the leases. This Court also certified the Arctic Litigation as a class action.

On July 16, 2004, this Court granted final approval to a settlement between Plaintiffs, Arctic, and D&A, awarding the Class $5,583,084, which equaled the total amount of maintenance escrow funds Arctic owed, plus interest. Pursuant to the settlement agreement, Plaintiffs agreed that Arctic/D&A would pay no more than $900,000. Defendants assert that Plaintiffs accepted this lower amount with the express purpose of seeking the remainder of the settlement amount from Comerica.

## 2. Arctic's Revolving Credit Loan Agreements and Accounts with Comerica

Arctic and Comerica entered into three revolving credit loan agreements (which established a revolving line of credit), one dated February 4, 1991, one dated May 3, 1993, and the other dated April 29, 1998. The loan arrangement between Arctic and Comerica was in operation continuously from February 1991 through November 1998.

For the 1991 loan agreement, Comerica agreed to lend Arctic up to $500,000 wherein several variables, including the amount of eligible collateral, determined how much Arctic could request be advanced by Comerica at any given time. By May 1993, the revolving loan agreement increased the commitment amount to $2,000,000. By April 1998, the revolving loan agreement increased the commitment amount to $5,500,000. D&A acted as a guarantor in the event of default by Arctic. D&A was not, however, and has never been, a customer of Comerica's and never had an account with Comerica.

At the same time as the loan agreements were in effect, Arctic maintained three accounts with Comerica: (1) a depository/operating account, (2) a zero-balance checking account (also

called a controlled disbursement account), and (3) a cash collateral account. The lending relationship was as follows: when Arctic completed a shipment for a customer, Arctic would generate an invoice. If the invoice qualified as an "Eligible Account," as defined in the loan documents, Arctic would include the invoice on its next Borrowing Base Certificate and present it to Comerica.[1] Upon receipt of the Borrowing Base Certificate, and to the extent that the invoiced amounts were "Eligible Accounts," Comerica would make available to Arctic 80% of the eligible invoice for its line of credit, regardless of whether Arctic intended to use funds advanced. Arctic would then request those funds be advanced to its depository/operating account. So, for instance, if Comerica had an invoice for an Eligible Account worth $100, Comerica would extend credit of up to $80 to Arctic, which would be transferred at Arctic's request to its depository/operating account before receipt of any payments from the customer.

When payments from customers were collected on the accounts receivables, they went directly into Arctic's cash collateral account. Comerica had control over the funds in the cash collateral account, and Arctic could not make withdrawals from the cash collateral account. The collections from customers were applied directly to the loan balance, which increased the availability to draw on the line. The cash collateral account was monitored daily by Comerica, and the balance was applied to the loan on a daily basis. When the invoice amounts were collected in full, Comerica would make available to Arctic the remaining 20% of the Eligible Account through its line of credit. At that point, Arctic would have 100% of the invoice amount available in its line of credit. So, for instance, in the above scenario, if the customer paid the

---

[1] Arctic was required to submit a Borrowing Base Certificate at regular intervals. A Borrowing Base Certificate is defined as a form intended for "setting forth Borrower's computation of the Borrowing Base."

entire invoice, then the full $100 would be available for Arctic to draw on through its line of credit. Arctic could request those funds be transferred into its depository/operating account and use them in any manner it saw fit and for any legitimate purpose necessary to run its business.

Arctic automatically transferred money from the depository/operating account into its zero-balance account to cover checks it wrote. At all other times, the zero-balance account did not carry a balance. Arctic wrote checks from its zero-balance account for any purpose it deemed necessary. Arctic authorized Comerica to debit the depository/operating account once per month to pay for accrued interest and bank fees. Otherwise, the money in the depository/operating account was for Arctic's unencumbered use and remained at its disposal. No loan payments to Comerica were ever deducted from the depository/operating account.

Pursuant to the loan agreements, Arctic pledged as collateral for the loans, among other assets, all accounts receivable for motor carrier services provided to customers and proceeds from the accounts receivable.[2] The primary purpose of the collateral was to provide a source for recovery of the loan balance in the event Arctic defaulted on its loan and the collateral had to be sold. Though accounts receivable collections were credited against Arctic's loan balance, this collateral was never liquidated, as liquidation occurs in the event of a default, and there was no default by Arctic.

Comerica asserts that it made available to Arctic 100% of accounts receivable that were collected, and Arctic could use these funds to pay the owner-operators' compensation and to contribute to the maintenance escrow fund. Therefore, Comerica asserts, it did not use or retain

---

[2]The "Collateral Value" was reported on the Borrowing Base Certificate as a percentage of total accounts receivable, less ineligible accounts. Combined with the value of other items, the Certificate calculates "Total Loanable Collateral."

Plaintiffs' maintenance escrow funds. Plaintiffs allege that Comerica collected the maintenance escrow funds from the cash collateral account and from them to pay down Arctic's loan obligations to Comerica.

At all times while the loan agreements were in effect, the loan balance was never zero. At the time the loan from Comerica was initiated, Arctic had a loan relationship with Ohio State Bank. When the loan with Comerica was executed in 1991, Arctic drew on its line of credit with Comerica to pay off the balance of its loan from Ohio State Bank. The outstanding loan balance to Comerica increased from that date forward until the loan relationship terminated in late 1998 when Arctic transferred its loan relationship to Congress Financial ("Congress"). At the time the loan relationship terminated, the outstanding balanced owed to Comerica was approximately $4.7 million. Arctic opened a new line of credit with Congress, and any availability in Arctic's line of credit with Comerica and any money in its accounts was at that time moved to Congress. Funds from the Congress line of credit were used to pay off the loan balance to Comerica. At that point, Comerica no longer held any of Arctic's money. Plaintiffs assert that Arctic would have owed more to Comerica at the termination of the loan had the maintenance escrow funds not been used to pay down the loan balance.

## B. PROCEDURAL BACKGROUND

On October 31, 2003, shortly before the trial in the Arctic Litigation was scheduled to begin, Arctic filed a bankruptcy petition in the United States Bankruptcy Court for the Southern District of Ohio, thus halting the Arctic Litigation. Plaintiffs allege that they first learned about Comerica's role in transferring the maintenance escrow fees out of Arctic's depository accounts on December 2, 2003, through testimony given in the bankruptcy case.

On January 16, 2004, Plaintiffs filed suit against Comerica, Arctic, and D&A in the United States Bankruptcy Court for the Southern District of Ohio, alleging that Comerica had the maintenance escrow funds owed to Arctic Class members. The case was subsequently removed to this Court as the present litigation. On May 18, 2004, Plaintiffs, Arctic, and D&A entered into a $5,583,084 settlement agreement in the Arctic Litigation, which was approved by this Court on July 16, 2004.

On April 27, 2005, Plaintiffs filed a First Amended Complaint, solely against Comerica. On May 16, 2006, this Court granted in part and denied in part Comerica's Motion to Dismiss the Amended Complaint. This Court held that it did have subject matter jurisdiction, contrary to Comerica's argument, because the federal Truth-in-Leasing regulations created a statutory trust over the maintenance escrow fees owed to the Arctic Class members, and therefore gave rise to a federal claim to recover those fees. However, this Court granted Comerica's Motion to Dismiss as to the 1993 loan agreement because Ohio law specified a six-year statute of limitations for "an action . . . upon a liability created by statute." Ohio Rev. Code ("O.R.C.") § 2305.07. This Court found that the maintenance escrow funds did not constitute a "continuing and subsisting trust," the recovery of which would not be subject to the statute of limitations.

Plaintiffs thereafter moved to amend the complaint a second time. Plaintiffs sought to plead facts showing that they could not have discovered their claim against Comerica until December 2003, and that any applicable statute of limitations did not begin to run until that time. Comerica did not oppose Plaintiffs' motion, and in part on that basis, this Court granted the motion on March 20, 2007.

The Second Amended Complaint contained identical substantive allegations as the prior version, and continued to seek relief in connection with the 1993 loan agreement. The only

difference is that the Second Amended Complaint added new paragraphs twenty-four through thirty, which set forth facts regarding Plaintiffs' discovery of their claim against Comerica. Plaintiffs alleged that pursuant to the Lease Agreements between Arctic and Class members, Arctic disclosed to Class members only the amount of maintenance escrow fees it withheld from their compensation, not where or how the fees were maintained. Further, under the escrow provisions of the Truth-in-Leasing regulations, Arctic was not required to hold the maintenance escrow fees in a separate account; according to Plaintiffs, "[f]unds returned to the owner-operator may be drawn from any source available to the carrier." Plaintiffs thus plead that they did not know, and did not have any reason to know, about any arrangements that Arctic made with respect to the maintenance escrow fees, let alone the loan agreements with Comerica.

On April 11, 2007, Comerica moved to dismiss the Second Amended Complaint. Comerica argued that Plaintiffs had ignored this Court's prior dismissal order and had improperly continued to plead that their entitlement to relief extended from July 1, 1993 to the present. This Court found that its prior dismissal order did not permanently foreclose any recovery for Plaintiffs in connection with the 1993 loan agreement and that Plaintiffs were not estopped from arguing that their claim arises out of the federal common law of trusts. Finding that the Plaintiffs' claim was one for restitutionary relief arising out of the common law of trusts, this Court held that the most analogous state statute of limitations was O.R.C. § 2305.09, which specified a four-year limitations period. This Court found that Defendants failed to allege that information was disclosed to Plaintiffs that would have alerted them to their claim against Comerica before December 2, 2003. As such, this Court held that the purposes of the Motion to Dismiss, Plaintiffs' claim against Comerica was timely filed.

Comerica and Plaintiffs have both moved for summary judgment on Plaintiffs' sole claim for breach of trust. Plaintiffs allege that Comerica breached its duty to hold maintenance funds in trust for Plaintiffs. Comerica asserts that a trust did not attach to funds in the cash collateral account, that there was no breach of trust, and that Comerica was a bona fide purchaser.

### III.  STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). But the non-moving party "may not rest upon its mere allegations." Fed.R.Civ.P. 56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

### IV. LAW AND ANALYSIS

### A. STATUTE OF LIMITATIONS

Comerica asserts that Plaintiffs' claim is barred by the statute of limitations. This Court previously ruled on Comerica's Motion to Dismiss. In that opinion, this Court found that a four-year limitations period applied and that Defendants failed to allege that information was

disclosed to Plaintiffs that would have alerted them to their claim against Comerica more than four years before they brought this suit. This Court stated,

> [Comerica] nowhere states that information was disclosed in the Arctic Litigation that would have alerted Plaintiffs to Comerica's allegedly wrongful conduct in transferring their maintenance escrow fees out of Arctic's accounts. Had Arctic defended in the Arctic Litigation by pointing the finger at Comerica as the possessor of Plaintiffs' trust property, had Arctic provided discovery to Plaintiffs showing Comerica's involvement, or had some other fact implicating Comerica emerged, Comerica's statute-of-limitations argument might have traction. As it is, however, Comerica asks too much by insisting that Plaintiffs were on notice of their claim against Comerica on June 30, 1997, just because they were on notice of their claims against Arctic.

*Owner Operator Indep. Drivers Ass'n, Inc. v. Comerica Bank*, 540 F.Supp.2d 925, 933 (S.D. Ohio 2008).

Comerica states that it has evidence that information was disclosed in the Arctic Litigation that would have alerted Plaintiffs to Comerica's involvement with Arctic's accounts. That information was outside the face of Plaintiffs' complaint, however, so it was not available for use in Comerica's Motion to Dismiss. First, named Plaintiff Harp had a copy of the settlement check he received from Arctic on August 22, 1994 after prematurely terminating his agreements with Arctic, drawn on a Comerica account. Harp never cashed that check, so it remained in his possession. Second, Comerica asserts that on or about August 24, 1998, Arctic provided Plaintiffs during discovery no fewer than 32 checks made payable to individual owner-operators, dating back to March 20, 1992, drawn on a Comerica account. These checks were included as evidence for this Court to review. Comerica served Plaintiffs with a request for admission relating to these checks on February 12, 2008. Plaintiffs never responded, however, so Comerica asserts these requests should be deemed admitted.

Information was disclosed as early as 1992 showing that Arctic had accounts at Comerica containing funds used to pay owner-operators. Comerica asserts that this evidence shows Plaintiffs' claim accrued, and the limitations period therefore began to run, no later than June 30, 1997, because as of this date, Plaintiffs knew that their maintenance escrow fees had not been returned to them, and could have learned, through the exercise of reasonable diligence, that Arctic deposited these fees with Comerica. Comerica asserts that Plaintiffs' failure to reach this realization for more than six years does not prevent the running of the statute of limitations.

Plaintiffs first argue against admitting into evidence the 32 checks made payable to individual owner-operators, drawn on a Comerica account. The Preliminary Pretrial Order required completion of discovery by February 15, 2008. And in that Order, the Court stated, "the discovery completion date requires discovery requests be made sufficiently in advance to permit timely response by that date." (doc. no. 30). Plaintiffs argue that Comerica's service three days prior to the discovery completion date was not timely, so Plaintiffs were not required to respond. Plaintiffs further assert that Comerica failed to comply with Local Rule 37.1 because Comerica never contacted Plaintiffs to attempt to resolve the discovery issue, or to seek a telephone conference with the Court.

Comerica only submitted two requests for admissions to Plaintiffs on February 12th, both requesting admissions of checks. Plaintiffs had three days to respond within the discovery deadline. This Court finds that if Plaintiffs were unable to respond within that period, Plaintiffs could have objected to the requests or requested additional time. According to Fed. R. Civ. Proc. 36(a)(3), Time to Respond; Effect of Not Responding:

> A matter is admitted **unless**, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney. A shorter or longer

time for responding may be stipulated to under Rule 29 or be ordered by the court.

*Cohn v. Bracy*, No. 93-5883, 1994 WL 328302, at *4 (6th Cir. July 6, 1994) (emphasis added).

Local Rule 37.1 states:

> Objections, motions, applications, and requests relating to discovery shall not be filed in this Court, under any provision in Fed. R. Civ. P. 26 or 37 unless counsel have first exhausted among themselves all extrajudicial means for resolving the differences. After extrajudicial means for the resolution of differences about discovery have been exhausted, then in lieu of immediately filing a motion under Fed. R. Civ. P. 26 or 37 and S. D. Ohio Civ. R. 37.2, any party may first seek an informal telephone conference with the judicial officer assigned to supervise discovery in the case.

Contrary to Plaintiffs' assertions, Local rule 37.1 did not require Comerica to contact the Court regarding Plaintiffs' failure to respond to Comerica's requests for admissions. A matter is admitted ***unless*** the party receiving the request objects or answers. ***Plaintiffs had to take action so that the matters would not be deemed admitted***. Thus, the matters were admitted because Plaintiffs' failed to object, answer, or request additional time to respond. *See also Technology Recycling Corp. v. City of Taylor*, 186 Fed.Appx. 624, 634 (6th Cir. 2006) (if a party believes some privilege covers the discovery request, the party is obligated to object to the discovery in a timely manner). Local rule 37.1 was really applicable in this instance to Plaintiffs, not Comerica, because Plaintiffs were the ones who needed to make an objection or request additional time. Therefore, Plaintiffs should have informed Comerica that they needed more time to respond, and if they could not resolve the issue with Comerica, they should have filed their objection or request with the Court. Because Plaintiffs failed to make any objection, the checks are deemed admitted.

Plaintiffs next argue that even if the checks are admitted, the checks reveal nothing other than the fact that Arctic had a checking account with Comerica Bank. The checks contain

information relating solely to payment of net compensation. No information is on the checks that would reveal any credit relationship between Arctic and Comerica. No information is on the checks that would alert Plaintiffs that Comerica was holding their maintenance escrow funds or using those funds to pay down Arctic's indebtedness. Therefore, Plaintiffs assert, the checks would not cause a reasonable person to inquire further regarding Arctic's relationship with Comerica.

The statute of limitations is an affirmative defense, so the burden is on Comerica to show that the statute of limitations has run. *Campbell v. Grand Trunk W. R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001). Under the federal discovery rule, "the statute of limitations begins to run when the reasonable person knows, or in the exercise of due diligence should have known, both his injury and the cause of that injury." *Id.* One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence. *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984). Nevertheless, the federal discovery rules do not require every potential claimant to examine every document that he or she has the legal power to examine. *Heinrich v. Sweet*, 44 F.Supp.2d 408, 417 (D. Mass. 1999). A plaintiff cannot be expected to exercise diligence unless there is "some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence." *Michigan United Food and Commercial Workers Unions and Drug and Mercantile Employees Joint Health and Welfare Fund v. Muir Co., Inc.*, 992 F.2d 594, 598 (6th Cir. 1993).

As the checks themselves do not reveal that Comerica was holding or using Plaintiffs' maintenance escrow funds, it is questionable whether these checks put Plaintiffs on notice that Comerica might have these funds. In other words, would the exercise of reasonable diligence have made Plaintiffs aware that Comerica was a potential defendant? The issue of whether a

-13-

plaintiff should have discovered facts giving rise to the claim through reasonable diligence, "is properly one for the trier of fact, save for the exceptional case when it can be established that there is no material issue of fact." *Jones v. Rogers Mem'l Hosp.*, 442 F.2d 773, 775 n.2 (D.C. Cir. 1971); *see also Mest v. Cabot Corp.*, 449 F.3d 502, 512 (3d Cir. 2006) ("whether a plaintiff has exercised reasonable diligence is generally a factual question reserved for the jury [except when] the facts are so clear that reasonable minds cannot differ as to whether the plaintiffs exercised reasonable diligence"); *Cathedral of Joy Baptist Church v. Village of Hazel Crest*, 22 F.3d 713, 719 (7th Cir.1994) (emphasis added) (when a cause of action accrues for statute of limitations purposes is only a question for the Court "if the relevant facts are undisputed ***and*** only one conclusion can be drawn from them").

The relevant facts are undisputed, as it has been admitted that Plaintiffs received checks drawn on a Comerica account, so Plaintiffs were at least aware that Arctic had a checking account with Comerica. In addition, it has been admitted that Plaintiffs did not further investigate Comerica and Arctic's relationship. Nevertheless, reasonable minds could differ as to whether Plaintiffs exercised reasonable diligence in discovering facts giving rise to the claim against Comerica. There is a genuine issue of material fact on this issue. It is for a jury to decide whether Plaintiffs should have known of the need for inquiry into Arctic's relationship with Comerica over four years before Plaintiffs brought this suit, and therefore whether Plaintiffs' claims are barred by the statute of limitations.

## B. COLLATERAL ESTOPPEL

Comerica asserts that Plaintiffs seek to bind it to a settlement Plaintiffs reached in the Arctic Litigation, under the erroneous belief that all issues relating to the validity and amount of the consent judgment are now foreclosed and that Comerica is prevented form challenging those

issues. Comerica asserts this is an attempt to apply the doctrine of collateral estoppel (issue preclusion). Collateral estoppel prevents a party from relitigating issues that were decided against that party in a final judgment in prior litigation. Comerica asserts that Plaintiffs cannot apply collateral estoppel to the following issues: (a) whether class certification was proper in the Arctic Litigation; (b) whether Plaintiffs may obtain judgment based upon pre-1996 lease agreements with Arctic and D&A, or whether applying changes to the Motor Carriers Act to such agreements would be impermissibly retroactive; and (c) the amount of Plaintiffs' alleged damages.

Plaintiffs deny that they are attempting to invoke the collateral estoppel doctrine, but allege instead that the claims in this case must be proved on facts, and the resolution of legal issues, which were not determined in the Arctic Litigation. Therefore, Comerica's liability for the restitution of Plaintiffs' trust property will be determined by this Court's rulings, in the instant action, as to the operation of the loan agreements and Comerica's diligence in inquiring about the nature of funds on deposit in Arctic's accounts with Comerica.

## 1. Class Treatment

Comerica argues that Plaintiffs' claims against Comerica cannot be pursued on a class basis without first deciding whether class certification is appropriate. Comerica asserts that Plaintiffs cannot rely upon the "class" that was previously certified in the Arctic Litigation to proceed against Comerica; rather, Plaintiffs must establish that Rule 23's requirements have been met in this case. Plaintiffs assert that this suit is not a class action in nature, but a single claim to collect property that this Court previously awarded to the defined and identified class. Furthermore, Plaintiffs assert that this Court has already ruled on this issue in this action.

Comerica's argument that a separate class certification determination must be conducted in this matter has been raised and rejected previously in this action. This Court previously held:

> Defendant's objection to maintaining the class from the Arctic Litigation in this case is not compelling because this Court previously ordered a judgment for the Class. OOIDA, Order at 3 (March 15, 2004). Thus, the Class may continue to seek restitution from Defendant for the return of Plaintiffs' escrow funds.

*Owner Operator Indep. Drivers. Assoc. Inc. v. Comerica Inc.*, No. 2:05-CV-00056, 2006 WL 1339427, at *7 (S.D. Ohio May 16, 2006). Collateral estoppel does not apply to preclude Plaintiffs from recovering trust property after an alleged wrongful transfer to a subsequent transferee. *Id.* Therefore, Comerica's argument that Plaintiffs' claims against Comerica cannot be pursued on a class basis without first deciding whether class certification is appropriate is without merit and has already been decided against Comerica.

## 2. ICCTA Retroactivity

Comerica argues that Plaintiffs' action against Arctic and D&A was based upon the Interstate Commerce Commission Termination Act of 1995's ("ICCTA") creation of a private right of action. The ICCTA became effective on January 1, 1996. Among the changes the

ICCTA made to the Truth-in-Leasing regulations was the creation of a private right of action for violations of Truth-in-Leasing regulations. *See* 49 U.S.C. § 14704(a). Prior to the ICCTA, only the Interstate Commerce Commission ("ICC") could enforce the Truth-in-Leasing regulations. *See OOIDA v. New Prime, Inc.*, 339 F.3d 1001, 1006 (8th Cir. 2003). Therefore, Comerica asserts it is entitled to summary judgment with respect to all agreements signed before January 1, 1996 because the ICCTA cannot be retroactively applied.

Plaintiffs argue that in the Arctic Litigation, Arctic sought to bar recovery to Plaintiffs on leases executed prior to the effective date of the ICCTA, arguing that the ICCTA could not be retroactively applied. This Court found that the ICCTA did not alter motor carriers' substantive rights or expand the universe of plaintiffs who could bring claims because prior to January 1, 1996, Plaintiffs could have pursued their claims by complaining to ICC, so that ICC could bring a claim on their behalf. *Owner-Operator Indep. Drivers Ass'n, Inc. v. Arctic Express, Inc.*, 288 F.Supp.2d 895, 901 (S.D. Ohio 2003)*; Owner-Operator Indep. Drivers Ass'n, Inc. v. Arctic Express, Inc.*, 270 F.Supp.2d 990, 996 (S.D. Ohio 2003). Accordingly, as this Court has previously held in the Arctic Litigation, this Court now decides in this action that application of the ICCTA to pre-1996 leases carries no impermissible retroactive effect. *See Arctic*, 270 F.Supp.2d at 995-96.

Furthermore, Plaintiffs are not suing Comerica under the ICCTA. Plaintiffs bring an action for restitution under the federal common law of trusts. The nature of Plaintiffs' property interest in their maintenance escrows has been defined by the leasing regulations since 1978. Other than providing a private right of action, the ICCTA does not address owner operator rights under the Truth-in-Leasing regulations. Therefore, whether the ICCTA can be applied

retroactively to pre-1996 leases is not even an issue in this case; as such, no improper estoppel issue arises.

### 3. Damages

Finally, Comerica argues that Plaintiffs cannot rely on the doctrine of issue preclusion to establish the amount of Plaintiffs' alleged damages. Comerica asserts that Plaintiffs provide no other method for calculating the amount Comerica purportedly received in breach of trust except through the consent judgment in the Arctic Litigation. Comerica asserts Plaintiffs cannot seek to enforce a $5 million settlement with Arctic against Comerica, rely solely upon the underlying rulings that resulted in that settlement, yet claim that the two cases are distinct.

The Arctic Litigation resolved issues regarding the rights and obligations relating to the maintenance escrows as between Arctic and the Class. In approving the settlement in the Arctic Litigation, this Court determined that the methodology used to calculate the Judgment Amount was appropriate based upon the records maintained by Arctic and D&A.[3] (Prov. Order Approving Stmnt., May 28, 2004). Interest was calculated in accordance with the mandated rates set forth in the truth-in-leasing regulations. (*Id.*) The net balance in maintenance escrows and interest for each Class Member was calculated based upon the methodology approved by this Order. (*Id.*) On this basis, the total maintenance escrows awarded to the Class was $4,070,190, the total interest awarded was $1,512,894, and the total damages awarded was $5,583,084. (*Id.*) Therefore, the judgment awarded reflected the amount in unused maintenance escrows which Arctic failed to return to the Class in violation of the Truth-in-Leasing regulations.

---

[3]The measure of damages was calculated by matching lease terms for individual class members to maintenance expenses by truck unit and date. (Arctic Order dated March 15, 2004 at 3-4).

Comerica's liability for restitution of Plaintiffs' maintenance escrows is based solely on its own conduct. Regardless of Comerica's lack of participation in the damages calculation in the Arctic Litigation, Plaintiffs can seek restitution of the judgment amount from Comerica. This suit is an action to collect property that this Court previously awarded to the Arctic Class. This Court has already held that it had jurisdiction to order restitution of trust property "whether it is in the hands of the original wrongdoer or in the hands of a subsequent transferee." 2006 WL 1339427, at *7 (citing *Harris Trust Savings Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 250) (2000)). "[T]he Court is not aware of any case that applies collateral estoppel to preclude a plaintiff from recovering trust property after an alleged wrongful transfer to a subsequent transferee." *Id.*

This Court has already determined in this action that the maintenance escrows are trust property. 540 F.Supp. 2d at 927, 932; 2006 WL 1339427, at *4. The entire amount of trust property was determined in the Arctic Litigation to be $5,583,084, which is the amount of maintenance escrows plus interest that Arctic owed to the Class. If this Court determines that the maintenance escrows were included in an Arctic account with Comerica, and if this Court determines that Comerica withdrew funds from that account in breach of trust, then Comerica would be liable for the entire amount of trust property (provided Comerica is not a bona fide purchaser).

### C. PROPERTY THAT WAS SUBJECT TO THE TRUST

Comerica argues that though there was a maintenance escrow fund, Plaintiffs fail to establish that a trust exists. However, this Court has previously held in this case, "Plaintiffs' maintenance escrow fees were held in trust by Arctic." 540 F.Supp.2d at 932; *see* 2006 WL

1339427, at *4 ("funds held in escrow under 49 C.F.R. 376.12(k) were subject to a statutory trust"). Therefore, this is the law of the case.

Comerica also argues that Plaintiffs fail to show what property is subject to the trust (i.e. what funds were held in escrow). Comerica asserts that if a trust attached to any of the Comerica accounts at all, it attached to funds in the depository/operating account when the nine-cents-per-mile was deducted from owner-operator's compensation. Comerica contends that funds it credited to the Arctic loan balance from the cash collateral account were not subject to the trust because the trust was not formed yet.

Plaintiffs assert that the trust attached to funds in the cash collateral account when those funds were deposited by customers. Plaintiffs argue that Comerica collected Arctic's receivables, which included owner-operator escrows, and applied the receivables, including the escrows, directly to pay down Arctic's indebtedness. Hence, Plaintiffs conclude that Comerica retained the maintenance escrows as a reduction on Arctic's loan balance.

Whether the escrow fund provisions in the Truth-in-Leasing regulations created a statutory trust was a novel issue presented to this Court when considering the Motion to Dismiss. This Court found that imposing a statutory trust on funds held in escrow under 49 C.F.R. 376.12(k) "is consistent with the purposes of the truth-in-leasing provisions, which were enacted to protect owner operators from the abusive practices of carriers, especially with regard to escrow accounts." *Owner-Operator*, 2006 WL 1339427, at *4. There is no case law analyzing what funds are subject to a Truth-in-Leasing trust. There is a plethora of case law, however, analyzing statutory trusts created under the Perishable Agricultural Commodities Act ("PACA"). One of the purposes of PACA is to protect unpaid sellers of agricultural commodities. *Overton Distribs., Inc. v. Heritage Bank*, 340 F.3d 361, 364-65 (6th Cir. 2003). This is similar to the

purpose of the Truth-in-Leasing regulations, to protect owner-operators. "[T]he owner-operators entrusted their money to Arctic and relied upon Arctic to safeguard it and only to distribute it for legitimate purposes under the agreement." *Owner-Operator*, 2006 WL 1339427, at *4. Due to the commonality of purpose, this Court finds much of the PACA trust case law to be persuasive.

In PACA trust cases, the PACA trust beneficiary is not obligated to trace trust assets that have been commingled with non-trust assets. *J.A. Besteman Co. v. Carter's, Inc.*, 439 F.Supp.2d 774, 777 (W.D. Mich. 2006). The segregation of trust funds is not a prerequisite to the creation of a statutory trust. *See City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 98 (3d Cir. 1994), *citing Bergier v. Internal Revenue Serv.*, 496 U.S. 53, 62 (1990) ("[u]nlike a common-law trust, in which the settlor sets aside particular property as the trust res, § 7501 (tax trust) creates a trust in an abstract "amount" –a dollar figure not tied to any particular assets–rather than in the actual dollars withheld"). In other words, the creation of such a trust cannot be avoided by commingling the trust funds with other assets. *Id.* Nevertheless, even though the trust assets that are commingled with non-trust assets need not be specifically traced, the beneficiary still must establish that the trust assets are included in the assets the beneficiary is seeking. *See Sanzone-Palmisan Co. v. M. Seaman Enters., Inc.*, 986 F.2d 1010, 1012-14 (6th Cir. 1993) (plaintiffs must show that the produce-distributor received the trust funds, and that the trust funds were commingled with the general fund they are trying to reach); *Mid-Valley Produce Corp. v. 4-XXX Produce Corp.*, 833 F.Supp. 193, 195 (E.D. N.Y. 1993) (plaintiffs must show that the assets they are trying to reach include PACA trust funds); *see also Stelly v. Galley Supply Inc.*, No. 86-5662, 1996 WL 5742, at *3 (E.D. La. Jan. 5, 1996) ("the beneficiary of the trust must produce some evidence of the source of the monies used to make payments to the bank . . .").

Plaintiffs, as the beneficiaries of the Truth-in-Leasing trust, must thereby establish that Comerica received the trust assets (maintenance escrow fund) in the cash collateral account. *See Sanzone-Palmison*, 986 F.2d at 1012-14. If Plaintiffs can establish that Comerica received the trust assets, then Plaintiffs need not identify the maintenance escrow fund as separate from any other funds in that account. And each owner-operator need not identify his maintenance escrow fees, which were commingled with other owner-operators' fees.

To determine whether Comerica received the trust assets in the cash collateral account, and thereby whether that account was subject to the trust, this Court must determine at what point the trust was created. The question therefore is: was the statutory trust created when customers made payments into the cash collateral account, or was the statutory trust created when Arctic paid owner-operators their compensation? If the trust was created when customers made payments into the cash collateral account, it would be presumed that any money paid from that account, including money to pay down Arctic's loan obligations to Comerica, included trust assets.  If the trust was created when Arctic paid owner-operators their compensation from the depository/operating account,  it would be presumed that any money paid for bank fees and interest included trust assets.

According to federal trust law, a trust is created the moment funds are **withheld** from the beneficiary. *See Bergier*, 496 U.S. at 61-62 (tax trust was created "at the moment" the employer paid its employees' wages). According to the Truth-in-Leasing regulations, an escrow fund is:

> Money ***deposited by the lessor with either a third party or the lessee*** to guarantee performance, to repay advances, ***to cover repair expenses,*** to handle claims, to handle license and State permit costs, and for any other purposes mutually agreed upon by the lessor and lessee.

49 C.F.R. § 376.2 (emphasis added); *see In re Intrenet, Inc.*, 273 B.R. 153, 157 (Bkrtcy. S.D. Ohio 2002) (noting that the "practice normally followed in the industry" is for the lessee to hold the funds). The C.F.R. makes clear that an escrow fund was created when money was deposited by (i.e. withheld from) owner-operators.

Plaintiffs argue that the trust was created when customers made payments into the cash collateral account. They base this on the fact that owner-operators' compensation was calculated as a "percentage of gross line haul revenue." And "Gross line haul revenue" is defined as "amounts received by Carrier [Arctic] from its customer for the transportation of freight." (Ind. Contractor Motor Vehicle Lease Agmt. ¶ 4). Therefore, Plaintiffs assert, because the maintenance escrow fees were deducted from compensation, and because compensation was a percentage of the amount received in the cash collateral account (i.e. a percentage of gross line haul revenue), then the escrow fees were a part of the payments received in the cash collateral account.

Comerica argues that the trust was created when Arctic paid owner-operators their compensation from the depository/operating account. It bases this on the language in the Arctic Lease Agreement between Arctic and the individual owner-operators, and the language in the Independent Auditor's Report of Arctic provided to Comerica. The Arctic Lease Agreement states: "Contractor [owner-operator] authorizes the Carrier [Arctic] to ***deduct from settlements*** nine (9) cents per mile to establish a maintenance expense of lessee's tractor." (Arctic Lease Agreement: Authorization to Deduct Maintenance Escrow, emphasis added). Therefore, Comerica asserts, pursuant to the Arctic Lease Agreement, when Arctic paid owner-operators their compensation from the depository/operating account, ***Arctic deducted the maintenance escrow fees from such compensation***. The Independent Auditor's Report of Arctic provided to

Comerica states, "The **Company [Arctic] withholds** from the owner/operator load settlement a maintenance mileage allowance providing for anticipated repairs." (Ind. Aud. Report, bates no. 1050, emphasis added). According to the independent auditor, **Arctic was withholding the maintenance fees**, not Comerica.

This Court finds that the deposits by customers into the cash collateral account did not create an escrow fund, because until compensation was paid to owner-operators, nothing had been **withheld** from (or deposited by) them. Just because owner-operators' compensation was calculated as a percentage of the amount received by customers does not establish an escrow fund in the cash collateral account. It was only once the maintenance escrow fees were deducted (i.e. once the fees were "deposited" by the owner-operators) that an escrow fund was created. This case is similar to *Mid-Valley*, in that Comerica used cash collateral account funds to pay down Arctic's loan balance **prior to** the trust fund being created. *See also* 833 F.Supp. at 195 ("all transactions related to this loan took place prior to March 1991 when the trust funds at issue here arose"). Until the first settlement check was paid to an owner-operator, that owner-operator did not have an escrow fund account because there was nothing to withhold from the settlement amount. And only when an escrow fund came into existence was a statutory trust established that attached to all funds commingled with the escrow fund. Thereafter, the statutory trust attached to funds in the depository/operating account when the nine-cents-per-mile was deducted from owner-operator's compensation, but did not attach to the funds in the cash collateral account.

### D. WHETHER THERE WAS A BREACH OF TRUST

Under general trust principles, a third party, such as a bank, cannot be liable for receiving funds in breach of a trust unless the trustee's transfer of funds itself constituted breach of its duty to maintain the trust. *E Armata, Inc. v. Korea Commercial Bank of New York*, 367 F.3d 123, 128

(2d Cir. 2004); *see Harris Trust*, 530 U.S. at 250-51 (for a court to reach property held by a third party, that property must have been transferred to that third party in breach of trust). A breach a trust is "a violation by the trustee of any duty which as trustee he owes to the beneficiary." Restatement Second of Trusts § 201 (1959), cited by *Boulder Fruit Exp. & Heger Organic Farm Sales v. Transp. Factoring, Inc.*, 251 F.3d 1268, 1271 (9th Cir. 2001). Any liability of Comerica as a third-party transferee, therefore, must be predicated on a breach of trust by Arctic, the trustee. As the trust only attached to the depository/operating account, there could only be a breach of trust if either the funds deposited in that account were unlawfully encumbered (i.e. unavailable for Arctic to use to fund the maintenance escrow fund), or if funds in that account were unlawfully withdrawn.

According to Mark Conen ("Conen"), who was employed as Vice-President of Comerica from July 1993 through the end of 1998,

> [f]or both the 1993 and 1998 Loans, money in Arctic's depository/operating account was for Arctic's unencumbered use and at Arctic's disposal, except for the monthly interest and bank fees Comerica collected. No loan payments were ever deducted from the depository/operating account, which presumably would be drawn upon to fulfil the maintenance fee obligations. Monthly, Comerica would debit Arctic's depository/operating account to collect this interest and bank fees.

(Conen aff. at ¶ 12). According to Brad Hoffman, who was employed as Chief Financial Officer for Arctic from 1988 until 2000,

> [t]he only money that Comerica withdrew from Arctic's depository/operating account was the monthly amount Arctic agreed to pay Comerica as an interest charge along with monthly bank fees. Arctic authorized Comerica to debit the account once per month to pay for this accrued interest and bank fees.

(Hoffman aff. at ¶ 9).

Plaintiffs do not dispute that the money in the depository/operating account was for Arctic's unencumbered use, except for the monthly interest and bank fees. Plaintiffs also do not

dispute that the only transfer made to Comerica was to pay for the monthly interest and bank fees.

Pursuant to the Restatement of Trusts, a breach a trust is defined as "a violation by the trustee of any duty which as trustee he owes to the beneficiary." Restatement Second of Trusts § 201 (1959), cited by *Boulder Fruit,* 251 F.3d at 1271. A bank's retention of interest and service fees does not breach a trustee's obligations, provided the costs are "commercially reasonable." *E. Armata*, 367 F.3d at 134; *D.M. Rothman & Co., Inc. v. Korea Commercial Bank of New York*, 411 F.3d 90, 101 (2d Cir. 2005). Comerica asserts that the amounts Comerica collected in interest and fees were comparable to those charged its other borrowing customers. (Conen aff. at ¶ 12). Therefore, Comerica asserts, the interest and fees collected by Comerica were commercially reasonable, and not in breach of the trust. Plaintiffs do not dispute that the interest and fees charged by Comerica were anything other than reasonable.

The evidence shows that: (1) the funds in the depository/operating account, other than the funds used to pay interest and bank fees, were freely available to satisfy outstanding obligations to Plaintiffs; and (2) the interest and fees charged were commercially reasonable. Arctic's deposits into the depository/operating account and Arctic's allowance of Comerica to withdraw from that account to pay interest and fees were not in breach of trust. Comerica cannot be liable for receiving funds in breach of trust because the trustee's transfer of funds did not constitute a breach of trust.

## V. CONCLUSION

There is a genuine issue of material fact act to whether Plaintiffs' claims are barred by the statute of limitations. However, even assuming that Plaintiffs' claims are not barred, this Court finds that the trust attached only to funds in the depository/operating account, and not to

funds in the cash collateral account. As the trust attached only to funds in the

depository/operating account, there was not a breach of trust because the only funds withdrawn

from that account were drawn to pay commercially reasonable bank fees and interest. For the

foregoing reasons, Comerica's Motion for Summary Judgment is **GRANTED**, and Plaintiffs'

Motion for Summary Judgment is **DENIED**.

     **IT IS SO ORDERED.**

**___s/Algenon L. Marbley___**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT COURT**

**Dated: March 16, 2009**