**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **OWNER-OPERATOR INDEPENDENT** | : | |
| **DRIVERS ASSOCIATION, CARL HARP** | : | |
| **and MICHAEL WIESE, as Representatives** | : | |
| **of the Class and THE CERTIFIED CLASS** | : | |
| **OF OWNER-OPERATORS, Case No.** | : | |
| **C2-97-740 United States District Court** | : | |
| **for the Southern District of Ohio,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **Case No. 05-CV-0056** |
| **v.** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **COMERICA BANK,** | : | **Magistrate Judge Norah M. King** |
| | : | |
| **Defendant.** | : | |

**FINAL JUDGMENT**

## I.  INTRODUCTION

Plaintiffs, Owner Operator Independent Drivers Association, Inc. ("OOIDA"), Carl Harp and Michael Wiese, as representatives of the certified class of owner-operators, seek to enforce the final judgment entered by this Court on July 16, 2004, in *OOIDA v. Arctic Express, Inc.*, No. 97-750 (the "Arctic Litigation") against Defendant Comerica Bank ("Comerica"), Arctic Express, Inc.'s ("Arctic") creditor, for the return of maintenance escrow funds owed to the plaintiff class.  A bench trial was held in this Court on Defendant's affirmative statute of limitations defense, which is the sole remaining issue to be decided in the case.  After the trial, parties submitted proposed findings of fact and conclusions of law to the Court, followed by final response briefs.  For the reasons set forth below, the Court enters **JUDGMENT** for the Plaintiffs, and awards the class restitution **DAMAGES** in the amount of **$5,583,084.00**.

## II.  PROCEDURAL HISTORY

### A.  The "Arctic Litigation"

The underlying lawsuit forming the basis for this action began over fourteen years ago in this Court, and its material facts have been memorialized in at least eight published opinions since.[1]  On June 30, 1997, the owner-operators initiated a class action suit against Arctic and D & A for return of the maintenance escrow funds and other equitable relief.  The Plaintiffs alleged that Arctic and D & A violated the Truth-in-Leasing regulations of the Motor Carrier Act, 49 U.S.C. §§ 14101-02, 14704; 49 C.F.R. § 376 *et seq.*, by failing to return unused maintenance escrow fund balances to the class of owner-operators whose lease agreements with Arctic did not run full term.  Arctic is a federally regulated motor carrier that provides transportation services to the shipping public.  D & A is a non-carrier company that leases truck units to independent owner-operators.

Arctic moved to dismiss Plaintiffs' complaint, and Plaintiffs moved to certify their class action shortly thereafter.  On December 18, 1997, Magistrate Judge King ordered that all discovery be limited to issues related to class certification, and stayed all merits discovery during the pendency of Arctic's motion to dismiss.  (97-cv-750, Dkt. 22.)  Soon thereafter, on August 17, 1998, this Court entered an order staying all proceedings in the case pending the outcome of appellate rulings which held implications for the Arctic Litigation.  (*Id.*, Dkt. 35)  On March 3, 2000, following the Eighth Circuit's decision in *Owner-Operator Indep. Drivers Ass'n v. New*

---

[1] *See Owner Operator Indep. Drivers Ass'n v. Comerica Bank* (*In re Arctic Express, Inc.*), 636 F.3d 781 (6th Cir. March 3, 2011); *Owner Operator Indep. Drivers Ass'n, Inc. v. Comerica Bank*, 615 F. Supp. 2d 692 (S. D. Ohio 2009); *Owner Operator Indep. Drivers Ass'n v. Comerica Bank*, 540 F. Supp. 2d 925 (S.D. Ohio 2008); *Owner-Operator Indep. Drivers Ass'n v. Arctic Express, Inc.*, 288 F. Supp. 2d 895 (S. D. Ohio 2003); *Owner-Operator Indep. Drivers Ass'n v. Arctic Express, Inc.*, 270 F. Supp. 2d 990 (S.D. Ohio 2003); *Owner-Operator Indep. Drivers Ass'n v. Arctic Express, Inc.*, 238 F. Supp. 2d 963 (S.D. Ohio 2003); *Owner-Operator Indep. Drivers Ass'n v. Arctic Express, Inc.*, 159 F. Supp. 2d 1067 (S.D. Ohio 2001); *Owner-Operator Indep. Drivers Ass'n v. Arctic Express, Inc.*, 87 F. Supp. 2d 820 (S.D. Ohio 2000).

*Prime, Inc.*, 192 F.3d 778 (8th Cir. 1999), this Court denied Arctic's motion to dismiss, and then vacated the stay previously entered in the Arctic Litigation.  (97-cv-750, Dkt. 42.)

The Court granted partial summary judgment to the certified class of plaintiffs on the issue of liability, holding that Arctic's "transformation of the maintenance fund into 'non-refundable' monies [was] unrelated to the cost of maintenance of the Plaintiffs' vehicles, and therefore [was] in violation of § 376.12(k)," because "the non-refundable nature of the maintenance fund [was] no more than an early termination penalty thinly disguised by [Arctic]." *Owner Operator Indep. Drivers Ass'n, Inc. v. Arctic Express, Inc.*, 159 F. Supp. 2d 1067, 1076 (S.D. Ohio 2001).  The Court then ordered Arctic to return the net unused balance in the escrow accounts to Plaintiffs.  *See Owner-Operator Indep. Drivers Ass'n, Inc. v. Arctic Express, Inc.*, 288 F. Supp. 2d 895 (S.D. Ohio 2003); *Owner-Operator Indep. Drivers Ass'n, Inc. v. Arctic Express, Inc.*, 270 F. Supp. 2d 990 (S.D. Ohio 2003).

### B.  Plaintiffs' Bring Suit Against Comerica

In October 2003, Arctic and D&A filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the Southern District of Ohio, thus halting the Arctic Litigation. Plaintiffs maintain it was not until December 2003, through testimony given in the bankruptcy proceedings, that they first learned of Arctic's financing arrangement with Comerica and Comerica's actions in transferring the maintenance escrow funds out of Arctic's depository accounts to repay amounts owed to Comerica pursuant to its loan agreements with Arctic.[2]  In

---

[2]        This Court described the lending relationship between Arctic and Comerica in detail in its order on the parties' cross motions for summary judgment:

> Arctic and Comerica entered into three revolving credit loan agreements (which established a revolving line of credit), one dated February 4, 1991, one dated May 3, 1993, and the other dated April 29, 1998.  The loan arrangement between Arctic and Comerica was in operation continuously from February 1991 through November 1998….  Pursuant to the loan agreements,

January 2004, Plaintiffs commenced an adversary proceeding against Arctic, D&A, and Comerica in the bankruptcy court, seeking return of the escrow funds owed to the Arctic Litigation class members.  In May 2004, Plaintiffs entered into a $5.5 million settlement agreement with Arctic and D & A, which was approved by this Court in July 2004.  After entry of the judgment and finalization of Arctic's plan of reorganization, the Plaintiffs then sought to satisfy their judgment against Comerica in federal court.[3]

On May 27, 2005, Plaintiffs filed their First Amended Complaint against Comerica, seeking restitution or disgorgement of "the full amount in maintenance escrow funds plus interest in an amount equal to that awarded in Judgment entered in the Arctic Litigation."  (Dkt. 7.)  Comerica moved to dismiss Plaintiffs' claims, arguing, *inter alia*, that the statute of limitations barred Plaintiffs' claim for recovery against them.  This Court granted Comerica's motion to dismiss as to the 1993 loan agreement because Ohio law specified a six-year statute of limitations for "an action . . . upon a liability created by statute." Ohio Rev. Code ("O.R.C.") § 2305.07, and the maintenance escrow funds did not constitute a "continuing and subsisting trust," the recovery of which would not be subject to the statute of limitations.

Plaintiffs amended their complaint a second time, and Comerica moved to dismiss again. This time, the Court "found that a four-year limitations period applied and that Defendants failed to allege that information was disclosed to Plaintiffs that would have alerted them to their claim against Comerica more than four years before they brought this suit." *Owner Operator*, 615 F. Supp 2d at 698.  The parties filed cross-motions for summary judgment.  Regarding the statute of limitations defense, the Court held the following:

---

Arctic pledged as collateral for the loans, among other assets, all accounts receivable for motor carrier services provided to customers and proceeds from the accounts receivable.

*Owner Operator Indep. Drivers Ass'n, Inc. v. Comerica Bank*, 615 F. Supp. 2d 692, 695-96 (S.D. Ohio 2009).

[3] Plaintiffs' Complaint was filed against Comerica on January 16, 2004.

> The relevant facts are undisputed, as it has been admitted that Plaintiffs received checks drawn on a Comerica account, so Plaintiffs were at least aware that Arctic had a checking account with Comerica.  In addition, it has been admitted that Plaintiffs did not further investigate Comerica and Arctic's relationship. Nevertheless, reasonable minds could differ as to whether Plaintiffs exercised reasonable diligence in discovering facts giving rise to the claim against Comerica.  There is a genuine issue of material fact on this issue.

*Id.* at 701.

The Sixth Circuit, reviewing the issue de novo, affirmed this Court's ruling "that genuine issues of material fact exist which preclude a ruling, as a matter of law, on Comerica's statute of limitations defense."  *See Owner Operator Indep. Drivers Ass'n v. Comerica Bank (In re Arctic Express, Inc.)*, 636 F.3d 781, 803 (6th Cir. March 3, 2011).  The appeals concluded that "Comerica must therefore disgorge the trust property received in breach of trust unless it can establish a viable defense."  *Id.* at 801.

In its August 11, 2011, Order this Court found that the Sixth Circuit's holding conclusively established the issue of recoverable damages against Comerica at $5,583,084, and that the only issue at trial would be the viability of Comerica's statute of limitations defense. (Dkt. 84.)  The Court also granted Comerica's request for extraordinary discovery "in the form of interrogatories and depositions to determine when they knew, or when they should have known, about the Defendant's relationship with either Arctic Express, Inc. or D&A Associates, Ltd."  (*Id.*)  The Court clarified there, and in multiple subsequent orders, that Comerica was only entitled to attorney fact work product, not opinion work product.

The Court presided over a bench trial on Comerica's statute of limitations defense, which commenced on October 3, 2011.  On October 5, 2011, Plaintiffs produced a small portion of documents responsive to Defendant's prior requests for production.  On Defendant's request, the Court continued the trial to allow Plaintiffs the opportunity to produce all remaining responsive

documents, and give Defendant sufficient time to review the late production and depose any necessary witnesses.  (Dkt. 132.)  The trial resumed on October 31, 2011, and concluded that same day.  Defendant made an offer of proof after the close of trial, requesting the Court to reopen the issue of damages, but the Court denied this request.

### III.   FINDINGS OF FACT

### A.  The Plaintiffs and Their Counsel

Plaintiff OOIDA is a trade association that represents the interests of small-business truckers, owner-operators, and employee drivers at both the state and federal levels.  (Tr. 10/4, 123:21; 125:2–9.)  OOIDA protects its members through litigation, lobbying, and regulatory actions.  (*Id.* at 125:6–9.)  OOIDA was founded in 1973, and today has approximately 150,000 members and 250 employees.  (*Id.* at 123:21–124:8.)  OOIDA is a sophisticated organization that has a number of business operations.  (*Id*. at 145:12–146:19.)  Among the body of regulations OOIDA seeks to enforce for its members are the federal Truth-in-Leasing regulations.  (*Id.* at 125:10–25; 126:14–128:11.)  OOIDA was instrumental in helping to create a private right of action under these regulations when the Interstate Commerce Commission ("ICC") was terminated in 1995.  (*Id*. at 127:22–128:11.)

The Cullen Law Firm opened in 1997 as Cullen & O'Connell.  Paul D. Cullen, Sr., was a named partner and founding member of Cullen & O'Connell, together with K. Michael O'Connell.  In approximately 1998, Mr. O'Connell left the law firm, and the firm renamed itself The Cullen Law Firm.  Cullen and O'Connell began representing OOIDA even before The Cullen Law Firm was formed.  (Tr. 10/3, 156:6–158:5.)  Mr. Cullen began serving as OOIDA's general counsel in 1998; he succeeded Mr. O'Connell as general counsel.  (*Id.* at 162:9–163:6.)  Mr. Cullen has brought a number of class actions on behalf of OOIDA, and he has extensive

experience in the areas of motor carrier transport litigation and associated Truth-in-Leasing litigation. (*Id.* at 140:7–16.)

In 1997, Gregory Cork started working for the Cullen Law Firm. (*Id.* at 194:5–7.) He left the firm in 1999 or 2000. (Tr. 10/4, 46:14–24.) Joyce Mayers, a Cullen Law Firm attorney, joined the firm in 2000. (Tr. 10/31, 16:4–5.) Ms. Mayers graduated from law school in 1977. (*Id.* at 16:6–7.) On The Cullen Law Firm website, Ms. Mayers lists bankruptcy as one of her practice areas, and Ms. Mayers has represented OOIDA in at least four bankruptcy matters. (*Id.* at 18:18–19:10.) Ms. Mayers has never reviewed a lien search or conducted her own lien search. (*Id.* at 19:11–12:8.)

### B. Comerica's Lending Arrangement with Arctic

On February 4, 1991, Comerica entered into a revolving credit relationship with G&D Transport, Inc. ("G&D Transport"), (Tr. 10/3, 30:14-19; Ex. D40 at 110–39), which around 1993 became "Arctic Express, Inc." (*Id.* at 31:6–12.) Mark Conen oversaw Comerica's lending relationship with Arctic. (*Id.* at 30:10-13.) Mr. Conen has been employed at Comerica Bank for thirty-two years. (*Id.* at 30:2-4.) From 1991 to 1998, Mr. Conen worked for Comerica as the senior lender market manager for the Dayton, Ohio, loan production office. (*Id.* at 30:4-9.) Around 1993, G&D Transport changed its name to Arctic Express, Inc. (*Id.* at 31:6–12.) Comerica and Arctic executed a number of loan documents throughout the course of their relationship. (Tr. Exhs. D40; D41-1.) In furtherance of the lending relationship, Arctic gave security interests in its company assets to Comerica, evidenced by a security agreement granting Comerica a security interest in all of Arctic's accounts receivable. (*Id.* at 33:11-21; Ex. D40.) As explained by the Sixth Circuit:

> By operation of the loan agreements, Comerica collected the nine cents per mile
> in maintenance escrows along with Arctic's receivables and, in sweeping Arctic's

cash collateral account, used the maintenance escrows to repay amounts borrowed by Arctic under the loan agreements.

*In re Arctic Express, Inc.*, 636 F.3d at 801.

Comerica perfected its security interest in Arctic's accounts receivable on January 16, 1991, by filing UCC financing statements with the Ohio Secretary of State and the Franklin County Recorder.[4]  (*Id.* at 34:13-20, 35:1-8, 39:257–40:7, 73:20–25; Ex. D41-1 at Comerica 355–56.)  The UCC Financing Statement filed on January 16, 1991, identifies the debtor as "G&D Transport, Inc.," and identifies the secured party as "Comerica Bank-Detroit."  Section 4 states that "[t]his financing statement covers the following types (or items) of property:

> All accounts receivable, and general intangibles (including tax refunds), now owned or hereafter acquired by the Debtor evidencing any obligation to Debtor for payment of goods sold or leased or services rendered, all returned or repossessed goods, and Debtor's interest in all goods the sales of which gave rise to an accounts receivable. All inventory now owned or hereafter acquired by Debtor, wherever located and all proceeds from any sale of inventory.

(*Id.* at 35:1-22; Def. Ex. 41-1, Comerica 0356).  Comerica did not specifically identify "escrow funds" or "maintenance escrow funds" in its UCC Financing Statement.  (*Id.*)  None of the Loan Agreements, the Security Agreements, or the Revolving Credit Loan Agreements between Comerica Bank and Arctic was publicly filed, only the Financing Statement.  (*Id.* at 58:18-20.) Defendant's expert, Van Cohen, testified that "accounts receivable" are generally defined as "any money owed to the company."  (*Id.* at 74:1-8.)  As of 2008, however, Mr. Conen did not believe that the maintenance escrow funds at issue in this case were part of Arctic's account receivables pledged as collateral for Comerica's loan to Arctic.  (*Id.* at 53:19-54:14.)  He did not believe the maintenance escrow funds were "eligible accounts" under either the 1993 or 1998 loan agreements between Arctic and Comerica.  (*Id.*)

---

[4] It is standard practice for a bank to file a financing statement when it enters into a loan.  A bank files a financing statement to perfect its lien on an asset and to obtain priority as to subsequent lien filers.  (*Id.* at 74:11-21.)

Comerica periodically confirmed that its UCC Financing Statements were properly filed with both the Ohio Secretary of State and Franklin County Recorder.  (Exhs. D40; D41-1.) Comerica maintained UCC financing statements on file with Franklin County Recorder's Office and the Ohio Secretary of State's office against Arctic from January 1991 to December 1998. (Tr. 10/3, 42:25–43:5.)  On December 29, 1998, Comerica recorded the termination of its security interest against Arctic's accounts receivable and other assets.  (*Id*. at 38:5–11; 41:19– 42:4, 42:25–43:5; Ex. D98.)  In 1998, Arctic transferred its lending relationship to Congress Financial.  (*Id.* at 45:1-7.)

It was public record that Arctic and D&A had a lending relationship with Comerica Bank and that Comerica Bank had a lien on Arctic and D&A's accounts receivables. (*Id.* at 34:13–20.) UCC financing statements are filed publicly, and one can obtain copies of them from either the Secretary of State or county agency without the consent of the borrower.  (*Id*. at 74:23–75:9.) Comerica's UCC filings against Arctic were standard filings that would have been accessible by conducting a lien search on Arctic.  (*Id*. at 77:1–5, 77:12–14; Tr. 10/4, 86:17–19.)

### C.  The Lease Agreements and Arctic's Failure to Return Maintenance Escrows

Arctic, a company primarily engaged in the hauling of refrigerated freight, had between 300 and 400 owner-operator drivers leased to it in 1997, which would have put the company in the upper range of a medium size motor carrier, if not a large carrier.  (Tr. 10/4; 128:23-130:12). In the mid-1990s, OOIDA began receiving complaints from Arctic drivers about Arctic, specifically that drivers were not receiving a refund of their maintenance escrows accounts when they ended their relationship with Arctic.  (*Id*. at 129:8–16, 152:7–13.)  These complaints were made to the OOIDA member assistance department.  (*Id*. at 129:17–21.)  During this time,

OOIDA also received complaints that Arctic was overcharging and double charging drivers for repairs.  (*Id.* at 150:9–152:6.)

Plaintiffs Carl Harp and Michael Wiese are members of OOIDA.  On March 24, 1994, Carl Harp entered into an Independent Operator Motor Vehicle Lease Agreement ("Lease Agreement") with Arctic.  (Tr. 10/3, 84:13-85:9; Ex. D22.)  In addition to the Lease Agreement, Mr. Harp entered into a Lease/Purchase Option at Termination ("Lease/Purchase Option") with D&A Associates.  (*Id.* at 87:24–88:6; Ex. D23.)  In the Lease Agreement, Mr. Harp authorized Arctic to deduct nine cents per mile to establish a maintenance escrow account.  (*Id.* at 87:3-7; Ex. D22.)  The maintenance escrow funds covered repairs to equipment leased to Mr. Harp that were not covered by the manufacturer's warranty, such as the replacement or repair of tires and preventative maintenance.  (*Id.* at 87:8–14.)  Mr. Harp understood that the escrowed maintenance funds were put in an account for him to use to maintain the truck.  (*Id.* at 101:20-102:1, 102:19–25, 103:10–16, 105:9–11.)

During his orientation, Arctic promised Mr. Harp a new truck, but when he finished orientation Arctic did not have a new truck available to give him. (*Id.* at 89:12-17.)  On June 3, 1994, Mr. Harp signed a second set of these agreements so that he could have a new truck.  (*Id.* at 89:12–90:2.)  Arctic told Mr. Harp that the maintenance escrow fund from his first truck would be transferred to his new, second truck. (*Id.* at 90:9-11.)  When Mr. Harp switched trucks, however, Arctic refused to transfer the balance to the new truck.  (*Id.* at 90:12-17.)  Mr. Harp was aware that Arctic refused to transfer the escrow balance to the second truck.  (*Id.* at 90:3–17.)  On or about August 22, 1994, Mr. Harp received a check from Arctic in the amount of $1.78.  (*Id.* at 95:10–16.)  The check provides on its face the identity of Comerica as the issuing bank.  (Ex. D21.)  The check does not contain information of the existence of a debtor-creditor

relationship between Arctic and Comerica, i.e. the Revolving Loan Credit Agreement with Comerica, or that Comerica had an interest and control over Mr. Harp's maintenance escrow funds. To this day, Mr. Harp has kept this check in his possession. (*Id.* at 95:17–23.)

Consistent with the language in its written agreements with drivers, Arctic expressly informed its drivers that if the lease was terminated early the escrow funds would not be returned. (*Id.* at 91:4–18.) While Mr. Harp was driving for Arctic, there was no instance where Arctic failed to pay for any repair or maintenance performed on Mr. Harp's equipment, or any instance of any check drawn on Arctic's account bouncing. (*Id.* at 105:12-106:5.) On March 6, 1995, Mr. Harp ended his relationship with Arctic. (*Id.* at 92:19-22.) He received a maintenance breakdown summary that detailed the balance of his maintenance escrow fund at the time he ended his relationship with Arctic. (*Id.* at 92:10-16.) The balance on Harp's maintenance escrow account was approximately $6,000—an amount that Arctic refused to refund. (*Id.* at 93:12-13.)

Mr. Harp believed that that once he built up a sizeable escrow fund Arctic engaged in freight manipulation to force him to quit in order to deprive him, unjustifiably, of his maintenance escrow funds. (*Id.* at 99:5–13; Ex. D106.) Mr. Harp asked Arctic for the return of his escrow funds, but Arctic told him that those funds would not be returned to him. (*Id.* at 93:17–22.) Mr. Harp considered taking legal action against Arctic and contacted OOIDA regarding the same within a few months of March 1995. (*Id.* at 108:3–18.) Mr. Harp specifically asked OOIDA to help him get his maintenance escrow funds back. (*Id.* at 108:20–22; 111:23–112:8.) After his termination with Arctic, Mr. Harp did not know what Arctic did with his escrow funds. (*Id.* at 123:2–13.)

On June 11, 1996, Michael Wiese entered into similar written lease agreements as Mr. Harp's with Arctic that provided that Arctic would deduct nine cents per mile to a maintenance escrow account, and that Mr. Wiese would not have those funds returned in the event that he terminated his lease relationship with Arctic.  (*Id.* at 127:21–128; Exs. D19 & D20.)  Arctic paid Mr. Wiese weekly through a Comdata account.  Mr. Wiese never had a problem accessing funds that Arctic deposited into his Comdata account.  (*Id.* at 137:14-20).  By December 14, 1996, Mr. Wiese knew he intended to terminate his relationship with Arctic and D&A, but he was concerned that he was not going to get his maintenance escrow fund back.[5]  (*Id.* at 129:19–24.) As a result of these concerns, Mr. Wiese wrote a letter to OOIDA dated December 14, 1996, expressing these concerns and that he had been advised not even to attempt, legally or otherwise, to get the maintenance funds back.  (*Id.* at 130:8–15; Ex. P39.)

Mr. Wiese contacted OOIDA because he had read an article in *Land Line*, the official publication of OOIDA, regarding escrows and who owned them.  (*Id.* at 130:16–131:5.)  Mr. Wiese ultimately terminated his relationship with Arctic in March 1997.  (*Id.* at 125:17–19.)  At that time, Mr. Wiese believed that the money withheld by Arctic in fact belonged to him.  (*Id.* at 133:3–13.)  Although Mr. Wiese believed during the term of his relationship with Arctic that the maintenance funds were being withheld for his benefit, once his relationship ended and Arctic withheld the money, Mr. Wiese no longer believed that the Arctic was holding the money for his benefit.  (*Id.* at 138:4–11.)  In pursuing the return of his money, Mr. Wiese relied on his counsel and OOIDA to locate them and secure the return of his maintenance funds.  (*Id.* at 133:16–20.)

When OOIDA received complaints from drivers about Arctic and D&A, they gathered information about the company and sent it to The Cullen Law Firm.  (Tr. 10/4, 133:4–16.)

---

[5] Mr. Wiese was concerned because he had been specifically told by Arctic at his orientation that drivers who terminated their leases would not get the maintenance funds back and that other drivers who attempted to get a return of the funds were unsuccessful.  (Tr. 10/3, 130:1–9.)

OOIDA asked that the members submit documentation of the problems about which they complained.  These documents included the member's lease agreements and settlement statements.  (*Id*. at 131:10-22)  Mr. Harp complained in 1995 and Mr. Wiese in December 1996.  (*Id.*)  OOIDA believed that Arctic's and D&A's actions were a "clear violation of the leasing regulations." (*Id.* at 133:4–9.)  Based on the complaints made to it, OOIDA concluded that Arctic and D&A "had no intention of returning the escrow accounts," and the final settlement sheets showed they indeed had not returned them.  (*Id.* at 133:23–134:3.)  OOIDA decided to sue Arctic based on: (1) the lease contracts themselves that indicated that the company had no intention of returning the maintenance escrow funds; and (2) the final settlement sheets that disclosed to OOIDA that the escrow funds were not returned.  (*Id.* at 133:17-134:3.)

When suit was filed against Arctic in June 1997, OOIDA believed that Arctic controlled it members' maintenance funds.  The facts that supported OOIDA's conclusion that Arctic controlled the maintenance funds were that: (1) that Arctic itself was deducting those funds from the owner-operators' settlements; and that (2) Arctic was authorizing disbursement of those funds when they were required for maintenance of the truck.  (*Id.* at 134:24-135:7.)

### D.  Plaintiffs Bring Suit Against Arctic and D&A

On June 30, 1997, Plaintiffs filed a class action lawsuit against Arctic and D&A in this Court.[6]  In their Prayer for Relief, Plaintiffs only sought equitable relief; they did not request damages.  (Tr. 10/31, at 51–54; 56.)  The primary reason the lawsuit was filed was that Arctic

---

[6] In their description of the nature of the action in the Arctic Complaint, Plaintiffs sought:

> [D]eclaratory and injunctive relief; an immediate accounting of escrow and other funds deposited with Defendants by the various class members during their respective periods of association with Defendants; the return of such escrow and other funds to the class members with interest as calculated under applicable law; attorneys' fees and costs incurred by the class members in this action; and such other relief as may be deemed appropriate by the Court.

(Ex. D81, ¶ 1.)

and D&A were not returning the maintenance escrow funds to the owner-operators.  (Tr. 10/3, 141:13–22.)  The Cullen Law Firm represented Plaintiffs in the Arctic Litigation.[7]  (*Id.* at 140:21–141:12.)  Twice in the Arctic Complaint, Plaintiffs requested an accounting of all transactions and other activities relating to the class members' maintenance funds.  (Ex. D81 ¶ 1, and at 22.)  Plaintiffs also requested "an order enjoining and restraining Defendants from transferring, diverting, or otherwise concealing the class members' funds at issue . . . ." (Ex.D81, at 22.)  The Arctic Complaint sought the equitable relief of the return of the escrow funds and never specifically requested monetary relief.  (Tr. 10/31, 56:2-5; Ex. D81, at 21–22.)

Based on OOIDA's and The Cullen Law Firm's experience in motor carrier litigation generally and the Truth-in-Leasing regulations specifically, they knew that Arctic was not required to segregate or set aside the disputed maintenance funds.  (Tr. 10/4, 74:11–75:12.)  The Cullen Law Firm knew that the maintenance escrow funds could have been deposited into a bank account.  (*Id.* at 77:8–11.)  The Cullen Law Firm knew that Arctic legally could comingle the maintenance escrow funds with Arctic's other assets.  (*Id.* at 74:5–22.)  The Cullen Law Firm knew that Arctic could have spent the maintenance escrow funds to purchase equipment or trucks, or to pay for their general operating expenses.  (*Id.* at 77:12–78:12.)  In other words, Plaintiffs and their counsel knew that there was nothing in the applicable regulations that would have restricted the method by which Arctic and D&A enjoyed custody of the maintenance escrow funds.  (*Id.* at 77:17–19.)  The Cullen Law Firm formed no belief as to what Arctic was doing with the maintenance escrow funds.  (*Id.* at 75:13–17.)

Plaintiffs requested injunctive relief in the Arctic Complaint because they wanted to be sure that the Arctic defendants did not transfer or divert the maintenance funds.  (Tr. 10/3,

---

[7] Since 1997, Cullen has worked as the supervising attorney for Plaintiffs in the Arctic litigation. (Tr. 10/3, at 193:4–21.) Also involved in the Arctic litigation were Mr. O'Connell, Mr. Cork, Tom McCann, and Joyce Mayers. (*Id.* at 194:2–13; Tr. 10/4, 46:20–47:7.)

143:4–10.)  In Mr. Cullen's experience motor carriers sometimes use driver money as their own personal "piggy bank," spending it on impermissible items and overcharging the drivers.  (*Id.* at 147:5–9.)  Mr. Cullen considered the request for injunctive relief in the Complaint was important in such instances so that Plaintiffs could be sure that the motor carriers "had to account for the money that they had."  (*Id.* at 147:10-17.)  Despite this knowledge, Plaintiffs and their counsel made a conscious decision in this case, based on counsel's experience, not to seek preliminary or temporary injunctive relief to prevent Arctic and D&A from transferring the maintenance escrow funds to third parties. (*Id.* at 144:17–20.)  Plaintiffs and their counsel decided they were "not going to try and solve all of the problems of the owner-operators in one suit . . . ."  They instead made a decision to focus their efforts on establishing a private right of action under 12 C.F.R. § 376.12(k).  (*Id.* at 96:15–97:7.)  Plaintiffs and their counsel formed a "working hypothesis" that they would be able to obtain return of the maintenance escrows from Arctic.  (Tr. 10/4, 87:18–25.)

Plaintiffs and their counsel had checks in their possession as early as 1995 issued by Comerica Bank and payable to owner-operators contracting with Arctic.  (Tr. 10/3, 95:2–23; 176:3–14; Ex. D21.)  Plaintiffs and their counsel did not conduct any public records searches to determine what Arctic and D&A might have done with the maintenance escrow funds.  (Tr. 10/4, 97:13–98:23.)  No evidence was produced, however, of any public record containing the nature of the loan arrangement between Arctic and Comerica.  Plaintiffs took no steps to look for the maintenance escrow funds until Arctic filed for bankruptcy in 2003—more than six years after the Arctic complaint was filed.  (*Id.* at 116:14–19.)

Arctic's consistent position in the Arctic Litigation was that the retained maintenance funds belonged to Arctic.  (*Id.* at 72:25–73:4.)  Arctic took the position that the money was non-

refundable, and that Plaintiffs would not get the maintenance funds back. (*Id.* at 73:14–22.) The Cullen Law Firm determined that Arctic and D&A were somehow affiliated with Arctic Warehouse Services, Limited, EQI Investments, LLC, EQI Transport, and Elite Express. Plaintiffs do not recall, though, where they obtained this information about these related entities. (Tr. 10/31, 37:21–38:8.) There were no documents in either files of The Cullen Law Firm or OOIDA that identified these companies. (*Id.* at 38:20–39:2.) OOIDA and The Cullen Law Firm were also able to obtain information relating to the affiliation between D&A and Arctic using public information. (Tr. 10/3, 198:22–199:3, 201:18–202:8; Ex. P36.) The Cullen Law Firm knows how to hire an asset investigator. In fact, The Cullen Law Firm hired an asset investigation firm, Ross Financial, to investigate Arctic and its individual officers. (Tr. 10/31, 63:17–64:18; Exs. D183 & 185.) Neither Arctic nor OOIDA was able to locate any copies of materials that Ross Financial generated. (*Id.* at 66:2–7.)

### E. Plaintiffs' Actions Taken to Investigate Arctic

On July 24, 1996, Douglas Abel, a 49% percent owner of Arctic, filed suit against Richard Durst, a 51% percent owner of Arctic, in the Franklin County Court of Common Pleas, Case No. 96CVH07-5113 ("Abel Complaint"). (Ex. D215.) The Abel Complaint sets forth a verified, shareholder dispute. (Tr. 10/31 at 126:8–10; Ex. D215.) The Abel Complaint alleges that Mr. Durst and his wife Karen Durst were in possession of all the property owned by Arctic and that Mr. Durst had unlawfully excluded Abel from corporate matters and wrongfully terminated Abel's compensation. (Ex. D215 ¶¶ 6–7.) Mr. Abel requested that he be "made a co-signer on any and all checking, savings, and depository accounts of Arctic and D&A." (*Id.* at 3.)

On September 23, 1997, Mr. Cork discussed with Rick Craig of OOIDA, the "split and current relations between D&A owners Durst and Abel, and implications with regard to [the

Arctic] lawsuit." (Tr. 10/31, 121:19–25.)  On September 30, 1997, Mr. Cork spoke with Gary Green of OOIDA about a state court action that had been filed against Arctic.  (*Id*. at 124:14–19; Ex. D228, at 2:OOIDA000020.)  Plaintiffs and The Cullen Law Firm were not able to find any records of this lawsuit in their files.  (*Id*. at 125:3–6.)  Despite actual knowledge of a lawsuit concerning the ownership of funds of Arctic, Plaintiffs and The Cullen Law Firm saw no need to take steps to try to locate and protect the maintenance escrow funds. (*Id.* at 127:18–23.)

On February 2, 1998, Plaintiffs served discovery requests on Arctic and D&A that requested information regarding Arctic and D&A's handling of the maintenance escrows.  (Tr. 10/4, 98:24-99:7; Ex. D166, at Cullen000692–700.)[8]  The Cullen Law Firm's earlier drafts of those discovery requests contained even more pointed language requesting specific information about accounts in which the maintenance escrows were held, but The Cullen Law Firm made the conscious decision not to ask those questions in the final requests.  (Ex. D166, at TCLF00662.) Arctic objected to these discovery requests on the grounds that they were, *inter alia*, "beyond the scope" of the discovery order entered by Magistrate Judge King on December 18, 1997, and never provided Plaintiffs with answers to them.  (Tr. 10/4, 9:7-25; Pls. Ex. 9.)

---

[8] In those requests, Plaintiffs sought:

> 8. All records of account and other documents generated in connection with or relating to the collection, maintenance, deposit, transfer, and/or disposition of any funds deducted by Arctic from its lessors' settlement, escrow funds, or other compensation, including, but not limited to, documents generated in connection with or relating to funds deducted pursuant to the provisions of the Lease Agreement or pursuant to any similar provisions of any similar agreement. . . .

> 11. All records of account and other documents generated in connection with or relating to financial institution or other account(s) in which funds deducted from the settlements, escrow funds, or other compensation of Arctic lessors are held or deposited.

> 12. All records of account and other documents generated in connection with or relating to the disposition of the balance of funds remaining in any person's "escrow fund" account . . . .

(Ex. D166, at Cullen000696–97.)

Magistrate Judge King, in an Order entered on June 9, 1998, addressed Plaintiffs' discovery propounded upon defendants in the Arctic case, noting that "a dispute has arisen as to whether or not those requests are reasonably related to the motion to certify a plaintiff class." (Pls. Exh. 15.) Magistrate Judge King directed Plaintiffs "to propound to defendants interrogatories relating to the number of persons who would be included in the putative class . . ." *Id.* Judge King also limited document requests to 36 members of the putative class and limited the scope to the production of "the lease agreements, the lease/purchase agreements and settlement sheets for each such person." (Tr. 10/4,15:22-17:4; Pls. Ex. 15). The fact that, pursuant to the Court's discovery orders, Arctic was not required to produce responsive documents to Plaintiffs' requests for information regarding the disposition of the maintenance funds was in no way the fault of Plaintiffs or their counsel. (*Id.*)

In an April 15, 2002, letter, Arctic's counsel informed attorneys from The Cullen Law Firm that the maintenance funds had "long since" been withdrawn from Arctic's accounts, and it "remain[ed their] burden to identify and trace the maintenance funds in [Arctic's] accounts." (Tr. 10/31, 43:10–18; Ex. D214.) Despite being informed that (a) the maintenance escrow funds were maintained in an account, and (b) the escrow funds had been withdrawn from those accounts, The Cullen Law Firm did not serve additional discovery asking for the identity of the accounts, or asking Arctic to identify the amount of money that had been withdrawn from the accounts. (*Id.* at 44:2–45:7; 48:1–9.) Soon after, Plaintiffs filed an amended complaint in the Arctic Litigation, yet still took no action to name any entity to which the trust funds might have been transferred, such as naming a John Doe bank. (*Id.* at 49:14–22.)

On January 12, 2004, Ms. Mayers billed time to the Arctic matter for a discussion she had with Karen England (n/k/a Johnston) of OOIDA about a "Dun & Bradstreet" report on

Comerica.  (*Id.* at 22:17–21; Ex. D152, at TCLF3977.)  Plaintiffs admit that Dun & Bradstreet reports are "routine tools" that businesses and lawyers use to find out, *inter alia*, a business's debtor/creditor relationships.  (Tr. 10/3, 172:20–173:5.)  Neither Ms. Mayers nor OOIDA was able to find a copy of the Dun & Bradstreet report in their files.  (*Id*. at 25:8–15.)  OOIDA destroyed all of its files related to Arctic and Comerica in 2009.  (OOIDA Dep., 20:13–15, 20:24–21:13, 30:17–22.)

### F. The Four Boxes Produced by Arctic Containing Comerica Checks

On August 14, 1998, Plaintiffs' counsel traveled to Columbus, Ohio, and reviewed documents produced by the Arctic defendants in the Arctic litigation. (Tr. 10/4, 42:13–14, 108–09; Ex. D152, at TCLF003560.)  Plaintiffs do not know what documents were made available for inspection by the Arctic defendants.  Plaintiffs selected four boxes of documents from the production to be shipped back to The Cullen Law Firm.  (Tr. 10/31, 28:12–24; Ex. D174.)  The four boxes contained 33 checks drawn on a Comerica Bank account attached to an operator settlement sheet.  (Ex. D190, at OOIDA-Arctic 04885–918; Op. & Order at 12, Mar. 16, 2009, Dkt. 64.)  According to The Cullen Law Firm's attorney timesheets, the four boxes of documents, which were received by them in August 1998, were not reviewed for nearly two years.  Plaintiffs' attorneys decided to focus on matters they considered more significant.  (Tr. 10/4, 114:9–115:5; Tr. 10/31, 36:21–37:5.)

Plaintiffs received one of the boxes, identified as "Box 28," on or about August 24, 1998. (Op. & Order at 12, Mar. 16, 2009, Dkt. 64.)  Box 28 contained checks made out to drivers, attached to operator settlement sheets, representing the net settlement the drivers received from Arctic after deductions were taken for contributions to the maintenance escrow fund, among other items.  (Tr. 10/31, 29:5–31:12; 32:12–34:25; Ex. D174, at OOIDA-Arctic 4915.)  After

19

receiving the four boxes in August 1998, Plaintiffs did not serve a subpoena on Comerica. Plaintiffs never subpoenaed Comerica during the pendency of the Arctic Litigation.  (*Id*. at 35:4–10.)

### G. Plaintiffs' Lack of Actions to Learn the Status of the Escrow Funds

From the time the Arctic Complaint was filed, OOIDA shared in the belief that Arctic was a viable company that would be able to pay a money judgment that would result from the Arctic Litigation.  (Tr. 10/4, 137, 143:11–144:8.)  OOIDA performs credit checks on entities to which it loans money, and runs Dun & Bradstreet reports for the same purpose, but OOIDA chose not to do a credit check on Arctic.  (*Id.* at 147:1–148:5.)  Plaintiffs never considered the issue of collectability of the Arctic defendants.  (*Id.* at 89:10–18.)  Instead, Plaintiffs focused on their overwhelming concern at the time: establishing the legal precedent that drivers had a private right of action under federal law.  (*Id.* at 91:6–20.)

The Cullen Law Firm never asked their clients the entity on which their checks from Arctic were drawn.  (Tr. 10/3, 171:20–22.)  Plaintiffs never requested a Dun & Bradstreet report on Arctic or D&A. [9]  (Tr. 10/31, 21:6–10.)  At the outset of the Arctic Litigation, The Cullen Law Firm did not perform a UCC-1 search on Arctic or D&A to determine whether Arctic had granted a security interest in any of its property.  (*Id*. at 176:19–177:1.)  The Cullen Law Firm never performed a title search on Arctic's property.  (*Id.* at 177:2–4.)  It never searched for a tax lien on Arctic or D&A's real property, (*id.* at 177:5–9), and it never searched for mortgages on D&A's real property. (*Id.* at 177:11–13.)

When suit was filed against Arctic in June 1997, Mr. Johnston believed, based on his general knowledge of that company, that it was viable and solvent.  In 1997, Arctic was using

---

[9] Neither party introduced evidence in the form of an actual Dun & Bradstreet report on Arctic or D&A, nor requested the Court to take judicial notice of one.  As a result, the Court cannot determine what information regarding Arctic and its credit relationship with Comerica might have been revealed in such a report.

very good equipment, i.e. primarily late model trucks, which was above average for carriers of their size.  The fact that Arctic was using late model trucks indicated to Mr. Johnston that Arctic was a successful company, one that was fairly well off.  (Tr. 10/4, 130:20-137:6.)  When suit was filed against Arctic in June of 1997, OOIDA had no knowledge of Comerica's lending relationship with Arctic.  Mr. Johnston first learned of Comerica Bank's relationship to Arctic in 2003, through OOIDA's attorneys litigating the Arctic bankruptcy.  (*Id*. at 137:25-138:12).  Nothing in Arctic's court filings, from the outset of litigation through November 1997, including Arctic's Motion to Dismiss Under Doctrine of Primary Jurisdiction and related pleadings, caused Mr. Cullen any concern about his understanding of who controlled and used the maintenance escrow funds at issue.  (*Id*. at 3:6- 6:15).

On August 28, 1997, Mr. Cork of The Cullen Law Firm spoke with *Land Line* magazine about information OOIDA had gathered from Florence and Robert Badger of Augusta, Georgia, about Arctic's maintenance fund retention practices.  (Tr. 10/31, 119:14–25; 120:3–6; D228, at 2:OOIDA000026.)   Plaintiffs did not produce any documents or information gathered by the Badgers.  (*Id.* at 121:5–11.)   The Court finds that as of September 29, 1997, Plaintiffs and their counsel were aware that OOIDA's members were investigating Arctic's maintenance fund retention practices.  Diligent counsel would have been prompted at that time to obtain knowledge of, to the extent possible, Arctic's maintenance fund retention practices.

On September 23, 1997, Mr. Cork had a discussion with OOIDA members Steve Weed and Michelle Brickman about their former affiliations with Arctic.  (*Id.* at 123:20–124:13; D228, at 2:OOIDA000019.)  Plaintiffs did not produce any documents referencing Mr. Weed or Ms. Brickman.  (*Id.* at 125:4–5.)  On October 30, 1997, Mr. Cork spoke with Gary Green of OOIDA. (*Id.* at 130:14–131:2.)  Mr. Cork and Mr. Green spoke about former Arctic maintenance fund

supervisor, Briggs. (*Id.* at 131:13–15.) Plaintiffs did not produce any information about, or gathered from, Briggs. (*Id.* at 132:5–7.) Plaintiffs were prevented from discovering information from Arctic and D&A regarding the lending relationship between Arctic and Comerica from December 18, 1997, the date of Magistrate Judge King's order staying merits discovery until March 3, 2000, the date that this Court lifted the stay on the Arctic Litigation following the Eighth Circuit's decision in the *New Prime* case.

### H. Plaintiffs' Diligence in Similar Lawsuits for Return of Maintenance Escrows

On January 9, 2001, OOIDA's counsel, a bankruptcy attorney (and co-counsel of The Cullen Firm), wrote a letter to Huntington National Bank ("Huntington") informing Huntington that the bank may have escrow funds that rightly belonged to owner operators. (Tr. 10/31, 62:3–20, 87:13–16; Ex. D129.) Nine days later, on January 18, 2001, the trucking companies Roadrunner Trucking, Roadrunner Distribution Services, Advanced Distribution Systems and Eck Miller, declared bankruptcy. (*Id.* at 63:6–13.) These entities are subsidiaries of Intrenet.

Immediately after January 1, 2001, OOIDA began receiving telephone calls from members leased to Intrenet's subsidiary trucking companies, in which the members reported that the motor carrier was ceasing operation immediately, that the contracts between the driver and the motor carrier were terminated immediately, and that the driver was told to deliver the load and that there would be no further relationship between the motor carrier and the driver. Drivers also reported that their settlement checks from Intrenet's subsidiaries had bounced. (*Id.* at 89:15-92:15). Conversely, there were never any reports from OOIDA's members that any Arctic checks had bounced or that Arctic was ceasing operations. (*Id.* at 91:25-93:8).

On April 5, 2001, The Cullen Law Firm, on behalf of OOIDA, filed a class action complaint against Huntington. (*Id.* at 59:15–60:4; Ex. D84.) In the complaint, OOIDA sought

the return of escrow funds withheld by trucking companies.  (*Id.* at 60:5–6.)  In the class action complaint, OOIDA did not identify the type of banking accounts the trucking companies held at Huntington.  (*Id.* at 60:25–61:10.)  In fact, The Cullen Law Firm did not know the types of accounts the trucking companies held at Huntington.  (*Id.*)

### I.  Arctic's Representations Regarding the Maintenance Escrow Funds

Between March 5, 1998, and May 26, 1998, Plaintiffs' counsel Mr. Cork and defendants' counsel Charles Tell exchanged correspondence regarding discovery in the Arctic case.  (Tr. 10/4; 19:4-20:5; Pls. Ex. 37).  In a letter to Mr. Cork dated May 20, 1998, Mr. Tell addressed the issue of a potential stipulation relating to class certification.  In the letter, Mr. Tell stated, in part, "I would be willing to stipulate that D&A retained the maintenance escrow funds for each putative class member and that there are a large number of such individuals."  (*Id.* 21:12-23, 23:25-24:17; Pls. Ex. 37, TCLF 001784).  Plaintiffs and defendants in the Arctic case entered into a stipulation relating to class certification. (*Id.* at 39:13-19; Pls. Ex. 24). The stipulation was filed with the Court and is dated June 9, 2000. (*Id.* at 39:23-40:4)  The stipulation states:

> Defendants Arctic Express, Inc. and/or D&A Associates, Ltd. have retained and
> have not returned the 'maintenance funds' (as identified in Defendants' responses
> to Plaintiffs' Interrogatory Nos. 2-5 of Plaintiffs' First Set of Interrogatories
> Directed to Defendants Arctic Express, Inc. and D&A Associates, Ltd.) collected
> from over 600 of the persons identified by Defendants in Defendants' Response
> to Plaintiffs' Interrogatory No. 1 of Plaintiffs' First Set of Interrogatories
> Directed to Defendants Arctic Express, Inc. and D&A Associates, Ltd.

(Pls. Ex. 24). [10]

Mr. Cullen believed this language to be consistent with his understanding that Arctic and D&A had retained dominion or control over the maintenance escrow funds.  (*Id.* at 40:16-25.)

### J. Arctic and D&A Bankruptcy

---

[10] The stipulation was signed by counsel representing the plaintiffs and the defendants in the Arctic case. Thomas L. Long, of the firm of Baker & Hostetler, LLP, signed on behalf of defendants.

On October 11, 2001, D&A filed for bankruptcy, Case No. 01-bk-62009 (Bankr. S.D. Ohio). (Tr. 10/31, 50:10–13; 107:8–21; Ex. D194.) On November 16, 2001, D&A filed a financing statement in the bankruptcy court and disclosed that it had entered into a financing relationship with Comerica Bank. D&A provided Comerica's address and also identified Mr. Conen as a contact. (*Id.* at 108:18–110:6; Exs. D194 & D228.) Plaintiffs learned that Arctic, also, was "operating in the vicinity of insolvency." (*Id.* at 56:12–16.) Despite D&A's bankruptcy and their understanding of Arctic's dire financial condition, Plaintiffs did not at that time propound additional discovery requests in an attempt to locate the maintenance escrow funds. (*Id.* at 56:17–57:7.) Plaintiffs actually withdrew, and never re-filed, their motion to put aside a sum of money representing the amount of maintenance escrow funds that Arctic would be required to return to the drivers. (*Id.* at 57:17–23.) In May 2006, Ms. Mayers reviewed the filings from the first D&A bankruptcy (filed in 2001) to determine whether issues related to financing were disclosed. (*Id.* at 106:18–21; Ex. D228, at 2:OOIDA715.) Ms. Mayers claimed, however, that she never learned of any financing relationships between Comerica Bank and Arctic through the D&A bankruptcy. (*Id.* at 84:11–22.)

In 2003, Arctic filed for bankruptcy in the Bankruptcy Court for the Southern District of Ohio. On December 2, 2003, Plaintiff's counsel learned from the testimony of William Olipant, Arctic's controller, that from 1991 to 2003 Arctic had a lending relationship with three different institutions.[11] (*Id.* at 58:18–28.) Ms. Mayers was present for Mr. Olipant's testimony, and it was hearing that testimony that caused Plaintiffs to bring the present action against Comerica. (*Id.* at 58:9–59:14.) At that hearing, Ms. Mayers first became aware of the mechanics of Comerica's lending relationship with Arctic, including that Arctic had maintained a lockbox account with

---

[11] In 2003, Arctic's lender was Textron. (Mayers, Vol. IV, at 59:3–4.) From 1998 to 2001, it was Congress Financial. (Id. at 59:5–7.) From 1991 to 1998, Arctic's lender was Comerica. (Mayers, Vol. IV, at 59:8–10.)

Comerica in which the maintenance escrows were deposited and taken by Comerica to reduce Arctic's loan amount. (*Id.* at 80:25-81:12.) Prior to hearing Mr. Olipant describe the terms of the lending relationship between Arctic and Comerica, Plaintiffs did not believe it important to its claims whether Arctic was in a financing relationship with a financial institution. (*Id.* at 105:12–23.) Until Arctic filed for bankruptcy in 2003, Plaintiffs never looked for the maintenance funds to which they claimed they were entitled. (Tr. 10/4, 116:14–19.)

### K. Plaintiffs' Extraordinary Production

The Court's Order of September 20, 2011, required Plaintiffs to produce both the "time records" and the "billing records" in the two cases. In response to the Court's Order, Plaintiffs had produced "time records" for The Cullen Law Firm going back to December 11, 1997. Mr. Cullen testified at trial that his law firm had produced all of the time records available and that no time records were consciously destroyed. He testified that the inability of The Cullen Law Firm to find time records before December 11, 1997, may have been because the Cullen & O'Connell firm was a small start-up firm without an established billing system in place as well as because of the transition to The Cullen Law Firm, an event that occurred at approximately this time. (Tr. 10/4, 51:22-54:6). In response to questions from the Court, Mr. Cullen testified that while The Cullen Law Firm had produced all the time records relating to the Arctic and Comerica cases, neither he nor anyone associated with his law firm requested that OOIDA look for, and produce, the billing records sent to OOIDA by Cullen & O'Connell and The Cullen Law Firm. (*Id.* at 55:10-56:12).

The Court, in an Order dated October 5, 2011, adjourned the trial and ordered OOIDA to produce all documents responsive to the Court's Order of September 20, 2011. Mr. Johnston, appearing as OOIDA's Rule 30(b)(6) witness, testified that in response to the Court's Order of

October 5, OOIDA made a complete production of all the billing records in its possession regarding the Arctic and Comerica cases.  (Tr. 30(b)(6), 78:11-79:18⁺1:24-84:8; Def. Ex. 228). Upon examination, the Court has no reason to suspect that the late billing records produced by OOIDA are not, in fact, a complete set of billing records for both cases (Arctic and Comerica), and fill the gap of time missing from Plaintiffs' time records: namely, the period prior to December 11, 1997.  This Court, therefore, finds that Plaintiffs have now provided all the remaining billing records in their possession pertaining to the Arctic and Comerica cases.

According to the billing records produced by OOIDA, the law firm of Cullen & O'Connell began billing OOIDA for legal services relating to the Arctic matter beginning in April 1997.  The billing records produced by OOIDA are copies of the billing statements sent by the law firms of Cullen & O'Connell and The Cullen Law Firm.  (*Id.* at 78:11-79:18⁺1:24-84:8; Def. Ex. 228).  Besides the billing records, OOIDA produced an additional 636 pages of documents to Comerica in response to the Court's Order of October 5, 2011.  (Tr. 10/31; Pls. Ex. 41).  These documents were mostly pleadings relating to the Arctic and Comerica cases kept by Mr. Johnston in his personal files, along with some e-mail communications maintained by OOIDA relating to Arctic. (Tr. 30(b)(6), 87:8-90:11).

## L. OOIDA's Destruction of Case Documents

On August 23, 2011, Comerica served document requests on Plaintiffs.  (Ex. D218.) OOIDA looked for documents responsive to the requests.  (Tr. 30(b)(6), 28:7–12.)  Angel Burnell, the Assistant to Mr. Johnston, contacted Karen Johnston of the Business Assistance Department about the requests (*Id.* at 29:10–18).  Mr. Johnston learned that in 2009 OOIDA destroyed most of the documents related to the Arctic Litigation along with files from 16 other "old" cases, because they needed storage space (*Id.* at 20:10–21:13; 30:17–22).  According to

Mr. Johnston, the records that were destroyed were mainly lease contracts from owner-operators, all of which had previously been produced to OOIDA's attorneys.  (*Id.* at 20:25-21:13.)  OOIDA documents relating to its member complaints against Arctic would have been destroyed in 2009.  (*Id*. at 52:21–53:19.)  Documents related to the Arctic Litigation, the 2001 D&A bankruptcy, the 2003 Arctic bankruptcy, and the 2004 Comerica case all were destroyed in 2009.  (*Id.* at 55:9–56:10.)  OOIDA did not consult with their attorneys prior to destroying any documents in 2009 (*Id.* at 21:17-21.)

Between August 2011 and October 2011, only Ms. Mayers of The Cullen Law Firm spoke to OOIDA representatives about their document collection efforts.  (*Id.* at 65:12–16.)  OOIDA told Ms. Mayers that the documents had been destroyed in 2009.  (*Id.* at 62:15–63:1.)  Between August 2011 and October 3, 2011, OOIDA did not undertake any efforts to look for electronic documents.  (*Id.* at 68:3–8.)  In September 2011, OOIDA found documents (communications with members) but did not provide them to The Cullen Law Firm for production to Defendants.  (*Id.* at 33:11–34:5; 35:23–36:7.)  OOIDA did not collect these documents until after the October 5, 2011, trial adjournment.  (*Id.* at 34:6–10; 36:3–7.)

OOIDA did not receive a copy of the Court's Order dated September 20, 2011, before the trial began (*Id*. at 43:1–12; Ex. D220), or if OOIDA did, they took it to be a scheduling order (*Id*. at 44:12–13).  No one from The Cullen Law Firm talked to OOIDA about the September 20 Order.  (*Id*. at 45:9–11.)  The Cullen Law Firm provided no further instructions to OOIDA in September 2011 about document collection, despite the Court's orders. (*Id*. at 40:10–17.)  OOIDA did not search for documents between September 20 and October 3, 2011. (*Id*. at 45:16–21.)

Without a hold on OOIDA documents, all OOIDA emails are destroyed automatically after a year or two.  (*Id.* at 69:11–71:6.)  The Cullen Law Firm never issued a document hold notice to OOIDA in connection with the Arctic Litigation.  (Tr. 10/31, 25:17–20; 117:14– 118:3; 30(b)(6) Dep. 70:14–16.)  The Helmer law firm did not issue a hold notice to OOIDA in connection with the Arctic Litigation. (Tr. 10/31, 118:16–19.)  Neither The Cullen Law Firm nor the Helmer law firm issued a litigation hold notice to OOIDA with respect to the bankruptcy filed by D&A or the one filed by Arctic.  (*Id.* at 118:4–11, 118:20–25.)  Neither firm issued a document hold notice to OOIDA in connection with the litigation against Comerica.  (*Id.* at 25:13–16; 118:12–15; 119:1–3; Tr. 30(b)(6), 70:16–19.)

The Cullen Law Firm did not share Comerica's Motion to Compel and Reply with OOIDA.  (Tr. 30(b)(6), 59:18–22; Exs. D221 & D222.)  The Cullen Law Firm did not give OOIDA a copy of Comerica's Trial Brief, which was filed on September 30, 2011. (*Id.* at 94:1– 8.)  OOIDA first learned of Comerica's spoliation allegations at trial, held between October 3 and 5, 2011.  (*Id.* at 94:22–95:4.)

## IV.  CONCLUSIONS OF LAW

### A.  Defendant's Request for an Adverse Inference Sanction

Comerica requests sanctions against Plaintiffs in the form of an adverse inference. Comerica claims that OOIDA's destruction of case documents and The Cullen Law Firm's failure to produce a complete set of responsive materials pursuant to Comerica's discovery requests and the Court's orders constitute spoliation and warrants an adverse inference that, to the extent Plaintiffs attempted to investigate Arctic's finances, that investigation revealed the lending relationship between Comerica and Arctic.  Because the Court's determination on Comerica's requested sanction implicates the Court's findings of fact relevant to deciding the

statute of limitations issue, the request for sanctions will be addressed prior to the merits of the statute of limitations defense.

Spoliation characterizes "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Forest Labs., Inc. v. Caraco Pharm. Labs., Ltd.*, Case No. 06-CV-13143, 2009 U.S. Dist. LEXIS 31555, at *6 (E.D. Mich. Apr. 14, 2009). Federal law governs the rules that apply to, and the range of sanctions a federal court may impose for, the spoliation of evidence. *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009). Among the district court's inherent powers is the "broad discretion to craft proper sanctions for spoliated evidence…including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence." *Adkins*, 554 F.3d at 651, 653 (6th Cir. 2009); *see also In re Global Technovations, Inc.*, 431 B.R. 739, 779 (Bankr. E.D. Mich. 2010) ("In a case tried to the court rather than a jury, the sanctions may include the court's drawing such an adverse inference."). Courts have advised that "[p]roper spoliation sanctions should promote two goals: (1) fairness (i.e., 'leveling the evidentiary playing field'); and (2) punishment to deter such improper conduct in the future, and to 'plac[e] the risk of an erroneous judgment on the party that wrongfully created the risk.'" *In re Global*, 431 B.R. at 779 (citing *Adkins*, 554 F.3d at 652).

Comerica contends that it is entitled to an adverse inference that if Plaintiffs performed any diligent search to locate the maintenance escrow funds it would have revealed the "lending relationship" between Arctic and Comerica. Comerica argues that because much of OOIDA's files and records related to both the Arctic Litigation and the instant case were destroyed in 2009, and The Cullen Law Firm's files are incomplete, there is no way of knowing whether additional searches for the maintenance escrows were undertaken by the Plaintiffs and/or their counsel, and

29

what those searches revealed, at any time from the mid-1990s until 2003. Comerica claims that the attorney time and billing records make "numerous references" to documents that should have been produced by The Cullen Law Firm, but are now purportedly missing.

The document evidence Comerica claims should have been produced based on the time records include: (1) Reports from Ross Financial Services; (2) Files related to the 1996 lawsuit between Messrs. Durst and Abel; (3) Notes from discussions with Florence and Roger Badger regarding Arctic's maintenance-fund retention practices; (4) Notes from discussions regarding Arctic's maintenance fund supervisor; and (5) D&B reports referenced in billing statements. (Dkt. 150.) Since Plaintiffs produced no documentation from any of these efforts to investigate the location of the maintenance funds, Comerica urges the Court to infer that "the missing and destroyed evidence revealed the lending relationship between Arctic and Comerica." (Comerica Reply, Dkt. 154, at 12.)

To establish an adverse inference instruction based on the destruction of evidence, Comerica, as the moving party, "must establish: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Beaven v. United States DOJ*, 622 F.3d 540, 553 (6th Cir. 2010) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

OOIDA and The Cullen Law Firm undoubtedly had a duty to preserve documents related to this case and the underlying Arctic Litigation during the pendency of those lawsuits. It is "well established that the duty to preserve evidence arises when a party reasonably anticipates litigation." *In re Global*, 431 B.R. at 780. Once the duty to preserve attaches, a party must

30

"suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Zubulake v. UBS Warbug LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003); *see also In re Nat'l Century Fin. Enters.*, No. 2:03-md-1565, 2009 U.S. Dist. LEXIS 68379 at *29, 41 (S.D. Ohio July 16, 2009) (relying, in part, on *Zubulake*).

Comerica's first element of spoliation is met insofar as Plaintiffs and their counsel have had an ongoing duty to preserve case-related documents since the outset of the Arctic Litigation, at the latest. With regard to the second, 'culpable state of mind,' element of spoliation, Plaintiffs' counsel admitted at trial that a litigation hold was never placed on OOIDA's files related to the litigation. For that group of destroyed documents, therefore, Plaintiffs and their counsel were at least negligent in allowing its destruction, *Zubulake*, 220 F.R.D. at 218, and sanctions may be imposed as a remedy. *See Beaven*, 622 F.3d at 554 ("'[T]he 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], *or negligently*.'") (quoting *Residential Funding Corp.*, 306 F.3d at 108).[12]

The third factor in finding spoliated evidence asks the Court to determine whether the allegedly destroyed or missing evidence would have been relevant to the movant's claims. As stated by the Second Circuit in *Byrnie v. Town of Cromwell*, to obtain the requested factual inference based on spoliation:

> [A] court must determine "whether there is any likelihood that the destroyed evidence would have been of the nature alleged by the party affected by its destruction." The burden falls on the "prejudiced party" to produce "some

---

[12]Plaintiffs' insistence that the Court must find "bad faith" in order to impose an adverse inference is erroneous. Plaintiffs rely on *In re Global*, a case from the bankruptcy court of the Eastern district of Michigan, in which the court concluded it was "bound by Sixth Circuit case law to require bad faith on the part of a spoliator, rather than mere negligence, before imposing an adverse inference." *In re Global*, 431 B.R. at 782. The more recent Sixth Circuit decision in *Beaven*, however, affirmed that in some cases, "'[the] sanction [of an adverse inference] should be available even for the negligent destruction of documents if that is necessary to further the remedial purpose of the inference.'" *Beaven*, 622 F.3d at 555 (quoting *Residential Funding Corp.*, 306 F.3d at 108.).

evidence suggesting that a document or documents relevant to substantiating his
claim would have been included among the destroyed files."

243 F.3d 93, 108 (2d Cir. 2001) (quoting *Kronisch v. United States*, 150 F.3d 112, 127-28 (2d

Cir. 1998)).

Comerica, therefore, in addition to making an adequate showing that files from Plaintiffs
are missing or destroyed, must also demonstrate a likelihood that the missing files were relevant
documents related to the lending relationship between Arctic and Comerica, and Comerica's
security interest in Arctic's accounts receivables. To determine whether Comerica has met its
burden on this third factor, the Court will examine each category of allegedly missing evidence
*seriatim*.

### 1. The Ross Financial report

The first area of "missing" documents identified by Comerica are alleged records
referenced in The Cullen Law Firm's attorney time records, but never produced. Plaintiffs'
attorney timekeeping and billing records indicate that Plaintiffs' attorneys took certain measures
to investigate the Arctic's financials. First, in May 2002 they hired Ross Financial to conduct an
asset investigation of Arctic, and the time records indicate that attorneys from The Cullen Law
Firm followed up with telephone conversations about the materials they received from Ross
Financial. Comerica argues that the materials produced by Plaintiffs should have included a
final "report," which may have revealed Plaintiffs' knowledge of Arctic's lending relationship
with Comerica and the interest Comerica held in the maintenance escrow funds.

Plaintiffs insist that Comerica has not satisfied its burden to show that such "missing
documents" ever existed in the first place. *See id.* This Court finds that because the time records
specifically reference "materials from [the] asset investigator" (Ex. D185), Comerica has met its
burden that such materials existed and should have been produced. However, the Plaintiffs did

not hire Ross Financial until 2002, which is two years *after* the relevant January 2000 statute of limitations cutoff date. Thus, the third element for spoliation is not met with respect to the Ross Financial materials, as the missing Ross Financial materials could not possibly have made Plaintiffs aware of the lending arrangement before the cutoff date, and thus these materials are not "relevant to [Comerica]'s claim or defense." *Beaven*, 622 F.3d at 553.

### 2. Files related to the Arctic shareholder dispute

Comerica's second class of allegedly missing documents is "files related to the 1996 lawsuit between Messrs. Durst and Abel." Comerica claims that a time entry from September 30, 1997, by Cullen Law Firm attorney Gregory Cork indicating that he spoke with Mr. Gary Green of OOIDA about the state court action filed against Arctic—undoubtedly referring to the shareholder dispute between Abel and Durst—is evidence of additional documents that should have been produced. The Court finds that this entry alone does not satisfy Comerica's burden of showing that any such documentation ever existed at all, let alone any that would be of the "nature alleged," i.e. documents revealing the lending relationship between Arctic and Comerica. *See Byrnie*, 243 F.3d at 108.

### 3. Information from the Badgers on Arctic's fund retention practices.

The third set of missing documents alleged by Comerica are the notes and records from discussions with OOIDA members Florence and Robert Badger regarding Arctic's maintenance-fund retention practices. An August 28, 1997, billing entry by Mr. Cork of The Cullen Law Firm indicates he held a "[t]elephone conference with Ruth of LandLine Magazine regarding insurance and maintenance fund retention practices and other information on Arctic gathered by Florence and Robert Badger." (Ex. D228 at 2: OOIDA000026.) Mr. Cork's time entry presents compelling evidence that OOIDA (or its agents at *Land Line*) at one time had in its possession

"information on Arctic" gathered by the Badgers regarding Arctic's "maintenance fund retention practices." (*Id.*)  No notes or record of the information conveyed to Mr. Cork from "Ruth," however, were ever produced by Plaintiffs.  Information about Arctic's "maintenance fund retention practices" is of the precise subject matter which may have enlightened the Plaintiffs to Comerica's security interest in Arctic's accounts receivables, including Comerica's control over the maintenance escrow funds.  *See In re Arctic Express, Inc.*, 636 F.3d at 788-89.  The Court already established, *supra*, that Plaintiffs would have had a duty to preserve such information.

Additionally, the Court finds it quite likely that Mr. Cork would have at the very least taken notes regarding what Ruth conveyed to him about the Badgers' information on Arctic's maintenance fund retention practices.  The Cullen Law Firm would have had an obligation to save those attorney notes, even though they may have represented privileged attorney work product and/or attorney-client communications.  *See Zimmerman v. Poly Prep Country Day Sch.*, 2011 U.S. Dist. LEXIS 40704, at *72-73 (E.D.N.Y. Apr. 13, 2011).  All three factors thus lean in favor of imposing some sort of sanction in light of these missing records.  First, a duty existed to preserve documentation of the Badgers' information, in whatever form, but it was not preserved. Second, the failure to place a litigation hold on files related to the Arctic Litigation resulting in their destruction was at least negligent on behalf of Plaintiffs and their counsel.  Finally, the record indicates that the missing evidence at issue very well may have informed Plaintiffs that Arctic's maintenance escrow funds, along with its other customer receivables, were directed into outside accounts, or accounts controlled by Comerica.  The information the Badgers had, in other words, may have been highly relevant to the statute of limitations defense at issue here.

Plaintiffs should bear the risk of prejudice from their failure to locate and produce records of the information the Badgers had gathered on Arctic's maintenance fund retention practices.

*See Zubulake*, 229 F.R.D. at 437.  No one can know what information the Badgers relayed to OOIDA, but the Court is satisfied that it would have been favorable to Comerica's case.  That being said, the Court is also mindful that at issue here is a single reference simply to "information" gathered by lay OOIDA members made over 14 years ago by an attorney who left The Cullen Law Firm over a decade ago.  While the failure to retain any records of the Badgers' information was certainly negligent, especially given the sophistication of the Plaintiffs and their counsel, it may be the case that the only additional documentation of the information were notes taken by Mr. Cork.  The Court finds no reason to disbelieve Plaintiffs' representations that if such documents were recovered, they would have been produced.

The Court therefore finds no evidence of bad faith on the part of Plaintiffs in either destroying or misplacing the evidence, and while negligent destruction may warrant a spoliation sanction in some instances, "[a]bsent exceptional circumstances, courts generally do not dismiss an action or permit an adverse inference without consideration of whether the party acted in bad faith."  *In re National Century*, 2009 U.S. Dist. LEXIS 68379, at *16*.  Unlike cases such as *Beaven*, where a specific piece of critical evidence was known to have existed and was intentionally destroyed, here the nature of the Badgers' information on Arctic, while relevant, is not certain, and the Court finds that the failure to produce it was not intentional.  *See Beaven*, 622 F.3d at 555 (where the intentional "destruction of the folder 'severely compromised' the Plaintiffs' case by depriving the Plaintiffs of the most relevant piece of evidence to prove their claims").

Comerica requests the Court to infer that Plaintiffs would have discovered the nature of Comerica's lending relationship with Arctic based on the missing records.  Given Plaintiffs' relative innocence in failing to produce the evidence of the information learned from the

Badgers, and the uncertain weight of the information, the Court finds Comerica's requested inference to be unduly punitive, as it would likely be dispositive of the case in Comerica's favor. *See id*. at 554 ("When appropriate, 'a proper spoliation sanction should serve both fairness and punitive functions,' but its severity should correspond to the district court's finding after a 'fact-intensive inquiry into a party's degree of fault.'") (quoting *Adkins*, 554 F.3d at 652-53).

This Court concludes that in light of Plaintiffs' culpable negligence in failing to produce records of the information conveyed by the Badgers, the following adverse inferences of fact are warranted: (1) As of September 29, 1997, Plaintiffs and their counsel were aware that OOIDA's members were investigating Arctic's maintenance fund retention practices; and (2) diligent counsel would have been prompted to obtain knowledge, to the extent possible, of Arctic's maintenance fund retention practices.  These two inferences are accordingly adopted into the Court's Findings of Fact.

### 4. Notes from discussions regarding Arctic's maintenance fund supervisor

A fourth set of records Comerica alleges is missing and should have been produced are notes from discussions, again involving attorney Cork for The Cullen Law Firm, about information gained from OOIDA members on Arctic's maintenance fund supervisor at the time, "Mr. Briggs."  In a time entry dated October 30, 1997, Mr. Cork notes a telephone conversation about "information received from Members regarding former Arctic maintenance fund supervisor, Mr. Briggs and possible information to be gathered from Mr. Briggs."  (Ex. D228.) Unlike the record of information gathered from the Badgers, however, this entry merely refers to "possible information" to be sought from an individual.  The Court finds that this entry alone is not sufficient to meet Comerica's burden to show the existence of any notes taken or missing documentation of relevant information to satisfy the third element of spoliation.  *See Byrnie*, 243

F.3d at 108.  Additionally, the adverse inferences adopted by the Court in light of the missing records from the Badgers, above, serve to remedy the same prejudice as would an inference drawn from the allegedly missing evidence from Mr. Briggs.

### 5.  Dun & Bradstreet reports referenced in billing statements

Finally, Comerica asserts that Plaintiffs should have produced the Dun & Bradstreet report allegedly referenced in attorney billing statements which were produced.  Ms. Mayers billed time on January 12, 2004, for a discussion she had with Karen Johnston of OOIDA about a Dun & Bradstreet report on Comerica.  Neither Ms. Mayers nor OOIDA, however, were able to find a copy of any Dun & Bradstreet report for production to Comerica.  This time entry, as with the alleged missing files from Ross Financial, occurred long after the relevant cutoff date of January 2000 for the statute of limitations defense and after Plaintiffs learned about Comerica through the Arctic bankruptcy proceedings in 2003.  Thus, even if Plaintiffs obtained a Dun & Bradstreet report at the time of Ms. Mayers's entry, it would do little, if anything, to support Comerica's statute of limitations claim.  *Beaven*, 622 F.3d at 553 (the third factor when balancing the appropriateness of a sanction is whether this missing evidence "would support th[e] claim or defense").  Furthermore, Ms. Mayers testified that she does not recall having retrieved any Dun & Bradstreet report and is unsure whether one ever existed.  The Court finds no reason to disbelieve her testimony.  Finally, as no Dun & Bradstreet report on Comerica has been admitted into evidence, the Court is hesitant to assume what Plaintiffs would have discovered on one regarding Comerica's interest in the maintenance escrow funds.  For these reasons, no adverse inference is warranted based on the time entry from Ms. Mayers regarding a "D&B" on Comerica Bank.

### B.  Defendant's Statute of Limitations Defense

The law governing Comerica's affirmative defense of statute of limitations has been settled in this case for some time.  Plaintiffs' claim for restitution of their trust funds is governed by Ohio Rev. Code § 2305.09, which provides for a four-year statute of limitations for the "recovery of personal property, or for taking or detaining it."  The statute of limitations is an affirmative defense, and "'the burden is on the defendant to show that the statute of limitations has run.'"  *In re Arctic Express, Inc.*, 636 F.3d at 802 (quoting *Campbell v. Grand Trunk Western R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001)).

## 1. Accrual of the Statute of Limitations

The parties first dispute the applicable standard for determining when the statute of limitations began running in this case.  Comerica asserts that the four-year statute of limitations accrued and began running at the time of Plaintiffs' original injury; that is, as soon as Plaintiffs knew that Arctic had withheld their maintenance escrow funds beyond the time period mandated in their lease agreements.  Plaintiffs disagree, and argue that under the federal discovery rule, the statute of limitations for Plaintiffs to sue Comerica only began to run when Plaintiffs knew, or should have known, that an entity other than Arctic (namely, Comerica) had possession or control of the maintenance escrow funds.

In actions such as this, "where there is no applicable federal statute of limitations, '[a]lthough state law sets the length of the statute of limitations, federal law establishes when the statute of limitations begins to run.'"  *In re Arctic Express, Inc.*, 636 F.3d at 802 (quoting *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010)).  In remanding the case, the Sixth Circuit stated that "[u]nder federal law the limitations clock starts ticking when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation."  *Id.* (citations and internal quotation marks omitted).  This is referred to as

the "discovery rule," requiring potential claimants to act with reasonable diligence to discover "'both his injury and the cause of that injury.'" *Owner Operator*, 615 F. Supp. 2d at 700 (quoting *Campbell*, 238 F.3d at 775). As the Supreme Court recently stated in *Merck & Co. v. Reynolds*, "treatise writers now describe 'the discovery rule' as allowing a claim 'to accrue when the litigant first knows or with due diligence should know facts that will form the basis for an action,'" as opposed to the claim automatically accruing at the time Plaintiff is actually injured. 130 S. Ct. 1784, 1794 (2010) (quoting 2 Corman § 11.1.1, at 134).

Comerica disputes the applicability of the discovery rule in this case, asserting that the discovery rule is only relevant in cases where "the wrongful act [did] not immediately result in injury or damage." *Metz v. Unizan Bank*, 649 F.3d 492, 497 (6th Cir. 2011). Comerica argues that Plaintiffs' injury is the same injury for which they sued Arctic in 1997—namely, the unlawful withholding and failure to return the maintenance escrows. Plaintiffs must have known of this injury at that time, Comerica adds, because they brought suit for the funds' return. This Court already determined that "the Plaintiffs suffered actual harm as soon as the Defendants failed to return their escrow maintenance funds within the mandated forty-five-day period." *Owner-Operator Indep. Drivers Ass'n v. Arctic Express Inc.,* Case No. 97-cv-750, 2003 U.S. Dist. LEXIS 4217, at *19 (S.D. Ohio Jan. 28, 2003). Comerica further submits that as the four-year statute of limitations has run, it is Plaintiffs' burden to establish an exception to the statute of limitations "such as a tolling of the statute, late discovery of the injury, or the like." *Twee Jonge Gezellen, Ltd. v. Owens-Illinois, Inc*., 238 F. App'x 159, 161-62 (6th Cir. 2007).

Comerica's reliance on the *Metz* and *Twee Jonge* Sixth Circuit decisions, *supra*, in support of its argument against applying the discovery rule in this case is misguided. The courts in both those cases were interpreting state law respecting the application of "*Ohio's* discovery

rule." *Twee Jonge*, 238 F. App'x at 162 (emphasis added); *see also Dowdy v. Prison Health Svcs.*, 21 F. App'x 433, 434–35 (6th Cir. 2001) (which Comerica also cites, applying Tennessee law in holding that "[t]he discovery rule can toll the running of the statute of limitations, but only when the plaintiff is not put on inquiry because she has no knowledge that an injury has occurred"). Conversely, the *Winnett v. Caterpillar* case borrowed a state-law statute of limitations, as this Court does here, and applied the apposite federal discovery rule. In *Winnett*, the Court stated in unqualified fashion that "[u]nder federal law, as under most laws, the limitations clock starts ticking 'when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation.'" *Winnett*, 609 F.3d at 409 (quoting *Noble v. Chrysler Motors Corp.*, 32 F.3d 997, 1000 (6th Cir. 1994)). Following *Winnett*, the Sixth Circuit affirmed the federal discovery rule's application in the triable issue now before the Court of Comerica's statute of limitations defense:

> "[R]easonable minds could differ as to whether Plaintiffs exercised reasonable diligence in discovering facts giving rise to the claim against Comerica" and "[i]t is for a jury to decide whether Plaintiffs should have known of the need for inquiry into Arctic's relationship with Comerica over four years before Plaintiffs brought this suit, and therefore whether Plaintiffs' claims are barred by the statute of limitations."

*In re Arctic Express, Inc.*, 636 F.3d at 802-03 (quoting *Owner Operator*, 615 F. Supp. 2d at 701).

Comerica's arguments at trial do not persuade the Court to shift positions on this issue. The Court concludes that the federal discovery rule applies to Comerica's defense, and Comerica has the burden of proving that Plaintiffs' "discovered, or in the exercise of reasonable diligence should have discovered" their claim against Comerica prior to the statute of limitations cutoff.

### 2. Plaintiffs' Diligence Prior to Bringing Suit Against Comerica

#### a. Application of the Discovery Rule

Plaintiffs brought suit against Comerica for the return of the maintenance escrows on January 16, 2004. Thus, applying the discovery rule, if Plaintiffs knew, or "in the exercise of reasonable diligence should have discovered, the *acts constituting the alleged violation*," prior to January 2000, under the applicable four-year statute of limitations, their claim against Comerica is time-barred. *In re Arctic Express, Inc.*, 636 F.3d at 802 (emphasis added). There is disagreement between the parties over what "acts constituted the violation" in this case, i.e. which set of facts Plaintiffs knew or should have "discovered" to begin running the statutory clock. Plaintiffs contend that Comerica has the burden of proving that Plaintiffs knew, or through the exercise of reasonable diligence should have discovered, that their maintenance escrows had been taken by Comerica Bank prior to January 2000. Comerica claims that, on the contrary, the statute of limitations began to run when Plaintiffs knew of should have known of their initial injury forming the basis of the underlying lawsuit—which is Arctic's refusal to return the maintenance funds. Plaintiffs' knowledge of the original injury, argues Comerica, gave rise to a duty of Plaintiffs to investigate the location and disposition of the funds they were seeking in their lawsuit.

It is well-established that "[t]he statute of limitations commences to run when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Kennedy v. City of Zanesville*, 505 F. Supp. 2d 456, 489 (S.D. Ohio 2007) (quoting *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984)). Plaintiffs' action against Comerica "to recover under a federal common law trust theory," is related, but distinct from, Plaintiffs' original claim against Arctic. Although "plaintiffs' solitary claim against Comerica for restitutionary relief *stemm[ed]* from Arctic's alleged breach of trust," *In re Arctic Express, Inc.*, 636 F.3d at 801 (emphasis added), it was a different claim than the original cause of action against Arctic for failing to return the

41

drivers' maintenance escrows within the mandated time period in violation of 49 C.F.R. § 376.12(k).  *See Owner Operator*, 615 F. Supp. 2d at 703 ("Plaintiffs are not suing Comerica under the ICCTA.  Plaintiffs bring an action for restitution under the federal common law of trusts.").

More importantly, the two causes of action arose from slightly different facts.  Comerica is correct that Plaintiffs were aware of their injury at the hands of Arctic as soon as Arctic failed to return the maintenance escrows within the forty-five day period.  *See Owner-Operator*, 2003 U.S. Dist. LEXIS, at *19.  The "basis of [Plaintiffs'] action," *Kennedy*, 505 F. Supp. 2d at 489, against Comerica, on the other hand, occurred when "Arctic breached its trust obligations to plaintiffs by encumbering the escrow funds, and dissipating the trust assets, through its lending relationship with Comerica," in violation of the Truth-in-Leasing regulations.  *In re Arctic Express, Inc.*, 636 F.3d at 801.  Thus, Plaintiffs would not have been reasonably aware of the breach of trust claim against Comerica until they knew, or had reason to know, that the escrow funds had been transferred into Comerica's control in breach of the statutory trust.

The question before the Court, therefore, is whether Plaintiffs, through the exercise of reasonable diligence, should have discovered the nature of Arctic's lending relationship with Comerica before January of 2000.  *Owner Operator*, 615 F. Supp. 2d at 700; *Campbell*, 238 F.3d at 775 ("[T]he statute of limitations begins to run when the reasonable person knows, or in the exercise of due diligence should have known, *both his injury and the cause of that injury*.") (emphasis added).  Before they knew or had reason to know that the maintenance escrow funds were dissipated into Comerica accounts pursuant to the loan arrangement, Plaintiffs would not have been apprised of the factual basis forming their injury.  *Kennedy*, 505 F. Supp. 2d at 489.

The statute of limitations, therefore, did not begin to run until they had reason to know the funds were in Comerica's control.

### b. Plaintiffs Diligence in Discovering the Arctic-Comerica Lending Arrangement

With respect to the standard for evaluating "reasonable diligence," this Court has previously stated that:

> [T]he federal discovery rules do not require every potential claimant to examine every document that he or she has the legal power to examine.  A plaintiff cannot be expected to exercise diligence unless there is "some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence."

*Owner Operator*, 615 F. Supp. 2d at 700 (internal citations omitted) (quoting *Michigan United Food and Commercial Workers Unions and Drug and Mercantile Employees Joint Health and Welfare Fund v. Muir Co., Inc.*, 992 F.2d 594, 598 (6th Cir. 1993)) (emphasis added).

So, in the years prior to January 2000, was there "some reason to awaken inquiry" on the part of Plaintiffs and their counsel to "direct diligence in the channel in which it would be successful" in locating the maintenance escrow funds?  In other words, did Plaintiffs have any reason to inquire into, and diligently investigate, what Arctic was doing with the maintenance escrow funds Plaintiffs claimed it had wrongfully withheld from them?  The facts of this case are unique and present a complex determination on this question.  Ultimately, the Court is compelled to conclude that under the circumstances, Plaintiffs did exercise reasonable diligence in pursuing their claim against Comerica, and were not negligent in failing to bring suit against them prior to 2003.  Comerica fails to meet its burden of showing that Plaintiffs should have discovered the acts constituting the alleged violation of the statutory trust over their maintenance escrow funds prior to January 2000.  *In re Arctic Express, Inc.*, 636 F.3d at 802.

43

Comerica asserts that Plaintiffs' knowledge of Arctic's wrongful withholding of the maintenance funds was sufficient to create a duty to investigate the location of those funds, which would have been no later than when the complaint was filed in the Arctic Litigation in 1997.  By that time, argues Comerica, Plaintiffs were on "inquiry notice" of the need to protect those trust funds, which included investigating any pertinent banks with which Arctic was associated.  The term "inquiry notice" "refers to the point where the facts would lead a reasonably diligent plaintiff to investigate further." *Merck*, 130 S. Ct. at 1797.  Under the discovery rule's application to the circumstances in this case, the statute of limitations began to run when Plaintiffs were on "inquiry notice" to investigate the location of the maintenance escrow funds.

Comerica's evidence in support of its claim that Plaintiffs were on inquiry notice of the need to investigate Arctic's includes: (1) Plaintiffs requested the identity of Arctic's bank in discovery requests, and earlier drafts of the requests went so far as to seek the account numbers, names, addresses and telephone numbers of Arctic's financial institutions; (2) OOIDA routinely runs credit checks on entities to which it loans money; (3) the attorneys with The Cullen Law Firm are highly experienced in the area of motor carrier transport litigation; (4) Plaintiffs specifically requested in the Arctic Complaint "an order enjoining and restraining Defendants from transferring, diverting, or otherwise concealing" the funds at issue; (5) Plaintiffs knew that Arctic could have used the escrow funds to purchase equipment or trucks, pay for their general operating expenses, or even deposited them in a bank account; and (6) the January 2001 lawsuit where OOIDA and the Cullen Firm brought a claim against Huntington for trust funds held.

Comerica also proffers specific events and occurrences which should have "awakened" Plaintiffs to the need to investigate the maintenance funds, including: (1) the July 1996 lawsuit

between the two co-founders of Arctic, where Mr. Durst and his wife were alleged to have misappropriated all of Arctic's corporate property; (2) the continuous complaints from drivers in 1997 to OOIDA and the Cullen Law firm concerning Arctic leasing practices; (3) Plaintiffs discovery and review of thirty-three driver settlement packets from Arctic showing settlement checks drawn on a Comerica account with corresponding settlement sheets; (4) D&A's declared bankruptcy in October 2001 wherein it was alleged that Arctic was "operating in the vicinity of insolvency;" and (5) in April 2002 when Arctic's counsel informed Plaintiffs that the trust funds had been held in an account and had long since been withdrawn from Arctic's accounts.

Comerica argues that Plaintiffs' affirmative choice not to investigate the location and disposition of the maintenance funds, or whether Arctic was misappropriating or encumbering the funds, demonstrates a lack of reasonable diligence. Plaintiffs admitted at trial that locating the maintenance funds was simply not a priority to them prior to finding out the nature of Comerica's interest in the funds at the bankruptcy hearings in 2003. Additionally, Comerica argues that Plaintiffs' failure to conduct any public record searches of Arctic's finances confirms Plaintiffs' lack of concern over whether they would be able to collect their judgment from Arctic. Comerica claims that Plaintiffs showed no diligence in locating the "pot of money" which they were suing for. Had they done so, Plaintiffs would have easily uncovered the fact that Arctic had a lending relationship with Comerica, which was public information.

The relevant cutoff for the applicable statute of limitations is January 2000, four years before Plaintiffs sued Comerica. Hence, any of Comerica's alleged triggering events post-January 2000 are irrelevant in determining Plaintiffs' diligence because even if such events would have awakened Plaintiffs to the need to investigate Arctic, they were inside the allowable four-year window prior to bringing suit. Comerica argues that the evidence of Plaintiffs lack of

diligence after January 2000, further demonstrates Plaintiffs' continued pattern of ignoring

relevant evidence, and is thus probative of Plaintiffs' decision not to make efforts to secure the

trust funds.  While Comerica's reasoning has force, the application of the discovery rule to this

case dictates that in order for Plaintiffs' claim to be time-barred, there must have been a

sufficient reason *prior* to January 2000 that would have awakened a reasonably diligent plaintiff

to inquire into Arctic's treatment of the maintenance escrow funds.  *See Owner Operator*, 615 F.

Supp. 2d at 700.  Therefore, the Court's analysis of whether circumstances would have prompted

Plaintiffs to exercise diligence ends with the cutoff date of January 16, 2000, and events after

that date are largely irrelevant.

Plaintiffs, of course, dispute having lacked any reasonable diligence in the prosecution of

both this case and the Arctic Litigation, and explain that their failure to identify Comerica's

interest in the maintenance escrow funds prior to the bankruptcy proceedings in 2003 was that

nothing suggested that Arctic was not in possession of the funds.  No fact arose during the Arctic

Litigation to channel Plaintiffs diligence in any direction other than to pursue their claim against

Arctic for the return of the funds.  Plaintiffs assert that none of the evidence Comerica introduced

at trial satisfies Comerica's burden to establish a "triggering event" suggesting wrongdoing that

would have prompted a reasonable plaintiff to inquire further into Arctic's practices with respect

to the maintenance escrows.  Likewise, Plaintiffs claim that Comerica introduced insufficient

evidence to demonstrate that a reasonably diligent plaintiff would have actually discovered the

facts constituting Comerica's wrongdoing from the facts available to Plaintiffs prior to the statute

of limitations cut-off date.

First, Plaintiffs argue that even if the Court determines that as a result of Comerica's

UCC filings, they were placed on inquiry notice of Comerica's interest in Arctic's assets, the

information in the UCC filings would not have triggered the statute of limitations because the filings merely disclose an interest in "account receivables."  Comerica admitted at trial that no publicly available information revealed the details of the operation of its loan arrangement with Arctic.  Second, Plaintiffs insist that, contrary to Comerica's assertions, they did act diligently in propounding discovery on Arctic requesting information about its finances, but were precluded in those efforts by the orders from the Magistrate Judge restricting discovery and staying the case entirely until after the statute of limitations cutoff date.  Finally, Plaintiffs argue that the evidence of the settlement checks disbursed to drivers which were drawn on a Comerica account revealed nothing to alert Plaintiffs of the need to inquire into Arctic's credit relationships.

### i. Plaintiffs' failure to conduct a lien search of Arctic

Comerica submits as evidence of Plaintiffs' lack of diligence Plaintiffs' failure to conduct even a basic lien search on Arctic to determine its financial status and the status of the maintenance escrows.  Plaintiffs contend, however, that no evidence was introduced regarding Arctic's finances or ability to return Plaintiffs' escrows from prior to January 16, 2000 that would have required Plaintiffs to perform any lien search.  Plaintiffs argue that even if the Court determines that they were on inquiry notice of Comerica's interest in Arctic's assets as a result of Comerica's UCC filing, these filings merely state an interest in "account receivables," a fact which by itself would not have been cause for concern prompting further inquiry into the maintenance funds.  No publicly available information revealed the injurious details of the operation of Comerica's loan arrangement with Arctic.

As of January 16, 1991, when Comerica filed UCC financing statements with the Ohio Secretary of State and the Franklin County Recorder, Comerica's interest in Arctic's "accounts receivable" as loan collateral was public information.  However, these filings did not contain

details of the mechanics of the revolving credit lending relationship between Arctic and

Comerica which involved the maintenance escrow funds being transferred.  While it is true that

"knowledge of all facts is not required to set off the prescriptive clock," *Isaak v. Trumbull S&L*

*Co.*, 169 F.3d 390, 399 (6th Cir. 1999), the mere existence of a bank's holding a security interest

in Arctic's account receivables does not even constitute "storm warnings" of potential

wrongdoing.  *Id.*

Comerica argument of the significance of the UCC Filing Statements is not aided by the

fact that its own senior lender and overseer of the Arctic account, Mr. Conen, himself did not

believe the maintenance funds to be part of the collateral pledged to Comerica.  This severely

undercuts Comerica's claim that Plaintiffs' would have been able to learn of Comerica's security

interest in the maintenance escrows by checking the publicly filed documents.  Once again, the

basis for the claim against Comerica was its wrongful transfer of the funds out of Arctic's

accounts in satisfaction of Arctic's debts.  Simply learning that Comerica had a lien on Arctic's

accounts receivables would not be enough to put Plaintiffs on reasonable notice that Comerica

actually held the maintenance escrow accounts.  As Comerica's own expert's admission

indicates, it may not even have been enough to alert a reasonable plaintiff that the maintenance

escrows were encumbered at all.

The information from the UCC Filing Statements is admittedly material, as they would at

the very least have awakened Plaintiffs to the possibility that their maintenance funds were in

some way encumbered, but they alone would not have been enough to alert a reasonable plaintiff

of the possibility of the wrongful transferring of the funds out of Arctic's control.  *See Michigan*

*United Food*, 992 F.2d at 600 ("We have held that 'information sufficient to alert a reasonable

person to the possibility of wrongdoing gives rise to a party's duty to inquire into the matter with

due diligence.'") (quoting *Au Rustproofing Center, Inc. v. Gulf Oil Corp.*, 755 F.2d 1231, 1237 (6th Cir. 1985)).

### ii. Documents produced by Arctic

In August 1998, Arctic produced documents pursuant to the Plaintiffs' discovery requests which were limited by the Court's orders, including four boxes containing driver compensation checks drawn on Comerica's accounts.  Comerica argues that Plaintiffs lacked diligence in not following up on the discovery of 33 settlement checks made out to drivers which were drawn on Comerica's accounts.  Comerica claims that Plaintiffs did not even open the boxes containing the checks for over two years.  Or, if Plaintiffs had opened them, their failure to subpoena Comerica or otherwise inquire into the financing relationship between Arctic and Comerica evidenced by Comerica's name on the settlement checks shows a lack of diligence into the facts that would have revealed the nature of the loan agreement.  Plaintiffs dispute that anything within the boxes would have alerted Plaintiffs to Arctic's lending relationship with Comerica.  Plaintiffs claim that this Court and the Sixth Circuit already determined that the compensation checks produced by Arctic in 1998 in "Box 28" were insufficient to prompt inquiry as a matter of reasonable diligence into channels that would have revealed Arctic's loan relationship with Comerica.

This Court, on summary judgment, "found that settlement checks . . . contained information relating solely to the payment of net compensation and did not reveal any credit relationship between Arctic and Comerica."  *In re Arctic Express, Inc.*, 636 F.3d at 802. "Consequently," the Sixth Circuit reasoned that "'[a]s the checks themselves do not reveal that Comerica was holding or using Plaintiffs' maintenance escrow funds, it is questionable whether these checks put Plaintiffs on notice that Comerica might have these funds.'"  *Id.* (agreeing with

this Court that, therefore, "genuine issues of material fact exist which preclude a ruling, as a matter of law" in light of the checks).

While Plaintiffs are not correct in claiming that these prior holdings determined the checks to be insufficient to prompt further diligence toward investigating the lending arrangement between Comerica and Arctic further, the Court decides that now as a finder of fact. These checks would have awakened Plaintiffs only to the fact that Arctic was banking with Comerica, a fact of equally neutral significance as the lien Comerica had on Arctic's accounts receivable revealed by the UCC Financing Statements.  To the extent that Plaintiffs were on inquiry notice to investigate the security of the maintenance funds, as explained further *infra*, the disclosure of the checks still would not have reasonably prompted Plaintiffs to direct inquiry toward Comerica, specifically, or exercise more diligence than they were able to as of August 1998.

Plaintiffs also highlight the fact that two months before the checks were produced, in May 1998, Arctic's lawyers had offered to stipulate that Arctic and/or D&A "retained" the maintenance escrow funds for each putative class member as evidence that Plaintiffs were reasonable in believing that Arctic still had the funds.  This stipulation is vague in its wording, and a sophisticated reader such as Mr. Cullen or Ms. Mayers would not understand that representation to mean that the escrow funds were necessarily *still* being retained by Arctic. Nonetheless, the proposed stipulation certainly would not have led Plaintiffs any *nearer* to the possibility that the funds had been transferred out of Arctic's possession.

### iii. Court orders limiting discovery and staying the Arctic Litigation

Plaintiffs' strongest defense against Comerica's allegations that they lacked diligence is that the Court's orders directed them away, and outright prevented them, from investigating

Arctic's finances and discovering the location of the maintenance funds.  Comerica persistently

claims that Plaintiffs should have diligently inquired into Arctic's disposition of the maintenance

escrow funds, and the Court does not disagree with that.  Mr. Cullen, by his own admission,

knew it was possible that Arctic might be disposing the Plaintiffs' funds in unlawful ways.  At

trial, Mr. Cullen stated that in his experience motor carriers often use driver money as their own

personal "piggy bank," spend it on impermissible items, and overcharge the drivers.  Mr.

Johnston then testified that OOIDA had received multiple complaints in the mid-to-late 1990s

that Arctic was engaged in overcharging drivers for repairs.

Plaintiffs and their counsel, therefore, had at least some reason to be looking into the

treatment of the funds they assumed were in Arctic's possession.  Plaintiffs tried to do just that,

however, with pointed discovery requests and interrogatories directed to Arctic seeking the

names of any financial institutions to which the funds had been transferred.  Because of the

limitations on discovery imposed on the parties early on in the case, however, Arctic was

relieved from its duty to respond to Plaintiffs' requests and disclose the transfer of the funds—

the very facts constituting their legal injury—until after the cutoff date had passed.  Plaintiffs'

properly-directed diligence, which in all likelihood would have awakened them to the need to

bring Comerica into the suit prior to January 2000, was frustrated by no fault of their own.

When Plaintiffs sued Arctic in 1997, Plaintiffs were familiar with Arctic, its operations

and condition of its equipment, and they believed Arctic /D&A to be viable and solvent.  The

drivers entered into lease agreements with Arctic, only, and Arctic collected the nine cents per

mile and created the maintenance escrow fund per those agreements.  It was Arctic, the motor

carrier, who had refused to return the unused balance in the drivers' maintenance funds as

required by law.  Similarly, Plaintiffs claim that nothing in the briefing or documents produced

by Arctic in the early stages of the Arctic Litigation suggested any entity other than Arctic held or controlled the maintenance funds.

Then, in December 1997, six months after filing the complaint, the Magistrate Judge limited all further discovery to "class issues," and Plaintiffs were barred from seeking merits discovery.  Plaintiffs propounded discovery seeking information on Arctic's finances in February 1998, but Defendants objected, pointing to the prior order limiting discovery.  The Magistrate Judge's second order in June 1998 sustained Arctic's objection and restricted the permissible scope of Plaintiffs' discovery even further, directing Plaintiffs to propound interrogatories relating only to the number of persons who would be included in the putative class.  The Order also limited Plaintiffs' document requests to the lease agreements, the lease/purchase agreements, and settlement sheets for 36 members of the putative class.

This Court entered a stay of all proceedings in the Arctic Litigation on August 17, 1998, which was not lifted until March 3, 2000, three months after the January 16, 2000 statute of limitations cutoff.  Arctic had filed a second motion to dismiss, challenging the private right of action under which Plaintiffs were pursuing their claims.  Moreover, the Court itself recognized that the appeals before the circuit courts, including the *New Prime* case in the Eight Circuit, threatened to do away with the Plaintiffs' case if the issues on appeal were resolved in Arctic's favor.  During this time, Plaintiffs contend their diligence was reasonably, and forcibly, channeled toward defending the private right of action in the appellate courts.  But, in any case, no evidence was produced by Comerica showing any fact during the pendency of the stay that would have diverted Plaintiffs attention toward Arctic's finances or credit relationships.  Rather, in May 1998, Arctic offered to stipulate that D&A "retained" the maintenance escrow funds for

each putative class member, which, if anything, would tend to lead Plaintiffs *away* from the fact that the escrow funds were in the control of Comerica Bank.

The effect the Magistrate Judge's orders was to bar Plaintiffs from seeking discovery as to any matter not implicated in the pending motion for class certification, which would include any discovery related to Arctic's and D&A's finances, such as their relationship with Comerica. Plaintiffs tried, in February 2008, to request documents from Arctic pertaining to any accounts and/or financial institutions connected to the funds in question. Had Arctic complied with these discovery requests, Plaintiffs presumably would have learned the nature of Arctic's loan arrangement with Comerica, and that Arctic was transferring the maintenance escrows into Comerica's accounts pursuant to that arrangement. These requests were served after the Court limited discovery to class issues, and the Magistrate Judge rightly sustained Arctic's objection to them.

Comerica argues that Plaintiffs should not be excused from their failure to search for, and locate, the maintenance escrow funds due to the stays in the case. For example, Comerica insists that Plaintiffs were still free to investigate and seek information on the escrow funds through discovery from third parties, such as Comerica. The Court has already established, however, that the public information regarding Comerica's lien interest, and the settlement checks with Comerica's name on them, would not have been enough to prompt reasonable diligence. Furthermore, if Comerica had been subpoenaed by Plaintiffs during the pendency of the stay on merits discovery for documents regarding its lending relationship with Arctic, Comerica may have raised a similar objection to producing responsive documents which were outside the scope of the "class issues" on which Plaintiffs had been ordered to focus their efforts.

The Court agrees with Comerica that, in general, a stay of discovery does not toll the statute of limitations.  *See Dowdy*, 21 F. App'x at 434–35.  Unlike the plaintiff in *Dowdy*, however, The Cullen Law Firm here did exercise due diligence "in trying to find out about any potential cause of action" from Arctic.  *See id.* ("Where a defendant conceals its conduct, preventing the plaintiff from discovering the cause of action within the limitations period, and the plaintiff exercised due diligence in trying to find out about the cause of action, tolling has been applied.").  And while Arctic did not necessarily outright "conceal" its conduct relating to the maintenance funds, it certainly was happy to use the court orders to its advantage by preventing Plaintiffs from discovering the arrangement it had with Comerica.  The well-established principle from *Sevier* states that "[a] plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." 742 F.2d at 273.  In retrospect, the Court finds that Plaintiffs could not have discovered the injurious transfer of the maintenance funds even through reasonable diligence, which they attempted, prior to the lifting of the stay in the case.

Plaintiffs' attempt to obtain records from Arctic of any accounts and/or financial institutions into which the maintenance escrows were being transferred or held represents due diligence directed toward the channel in which it would have been successful.  *See Owner Operator*, 615 F. Supp. 2d at 700; *Michigan United Food*, 992 F.2d at 598.  Plaintiffs made these discovery requests in February 1998, less than a year after bringing suit against Arctic.  Plaintiffs cannot be blamed for the limitations on discovery imposed by the Magistrate Judge, or the Court's subsequent stay in the case, which prevented them from actually discovering their injury.  Once Plaintiffs did become aware of the nature of Comerica's lending arrangement with Arctic in 2003, they immediately set about the task of bringing Comerica in as a defendant.

### c.  Effect of the Court's Adverse Finding

The Court established, *supra* Section IV.A.3, that the now-missing information Plaintiffs gleaned from the Badgers specifically related to Arctic's maintenance escrow practices would have prompted reasonably diligent plaintiffs' counsel to obtain knowledge, to the extent possible, of Arctic's maintenance fund retention practices.  This information came to the attention of Plaintiffs and their counsel on or about September 29, 1997, before the ordered limitations on discovery.  As of that time, Plaintiffs and their counsel were aware that OOIDA's members were investigating Arctic's maintenance fund retention practices.  The Court's adverse inference findings, in other words, effectively places Plaintiffs on inquiry notice of the need to investigate Arctic's treatment of the maintenance escrow funds as of as of September 1997.

It could be argued that because Plaintiffs did not immediately propound their discovery inquiring into the location of the funds, and instead waited until after discovery was limited, they failed to exercise reasonable diligence.  Such a ruling would be unfair.  It is entirely reasonable to have expected Plaintiffs to follow up on the information they received from the Badgers with discovery requests, which they did but only after the Magistrate's limiting order.  It is not reasonable, however, in hindsight to require Plaintiffs to have prepared such discovery in the two or three month interim between receiving the Badgers' information and the Magistrate's limiting order.  This Court appreciates the fact that Plaintiffs had other matters at hand which, if not more important, were at least more pressing at the time, including prevailing in certifying the proposed punitive class and ensuring that Plaintiffs would have a cause of action to pursue against any defendant in the first place.

Comerica argues that one other event prior to the discovery limitation should have awakened Plaintiffs to investigate Arctic's finances.  The Plaintiffs had actual notice, as of

September 30, 1997, that the chief shareholders of Arctic, Mr. Durst and Mr. Abel, were involved in a shareholder dispute, where Mr. Abel alleged that Mr. Durst and his wife Karen Durst were in possession of all the property owned by Arctic.  The 1996 lawsuit between Mr. Abel and the Dursts was apparently discovered by Plaintiffs within a reasonable amount of time after the inception of the Arctic lawsuit.  As with the information from the Badgers, therefore, even if the Court were to find that the allegations therein should have prompted Plaintiffs to inquire into the security of the maintenance funds, Plaintiffs timely discovery toward that end was proscribed by the Court.  It is not clear, in any event, how much concern the allegations in Mr. Abel's Complaint would have caused a reasonable Plaintiff, given that the lawsuit had been pending for over a year by the time Plaintiffs discovered it, and Arctic had in the meantime still been disbursing checks to its drivers on schedule.  Finally, this event would not have done anything to alert Plaintiffs to the existence of Comerica's lending arrangement with Arctic, "the channel in which [diligence] would [have been] successful."  *Owner Operator*, 615 F. Supp. 2d at 700.

When Plaintiffs sued Arctic in 1997, they were aware that Arctic had withheld the maintenance escrow funds wrongfully, but they were not aware that Comerica had taken control over the funds through its loan agreement with Arctic.  Plaintiffs did not become aware of Arctic's loan arrangement with Comerica until testimony alerted them to it during the Arctic bankruptcy proceedings in 2003.  Under the discovery rule, to prevail on its statute of limitations defense, Comerica had the burden of proving that Plaintiffs failed to exercise reasonable diligence in discovering the basis for their action against Comerica prior to the cutoff date.  To demonstrate this, Comerica needed to show that Plaintiffs had "some reason to awaken inquiry and direct diligence" into Arctic's lending relationship with Comerica before January of 2000.

*See Owner Operator*, 615 F. Supp. 2d at 701; *Michigan United Food*, 992 F.2d at 600.  The Court concludes that Comerica has not satisfied its burden of proof.

Comerica provided evidence that at best established Plaintiffs knew, or should have known, that Comerica had a lien on Arctic's accounts receivable.  But Comerica's own account manager did not understand that to include an interest in the maintenance escrow funds.  Additionally, as it did on summary judgment and on appeal, Comerica provided the evidence of the settlement checks Arctic produced in August 1998 as sufficient to trigger inquiry into Comerica's relationship with Arctic.  The settlement checks only showed Comerica's identity as a bank Arctic was affiliated with, which again would not reasonably awaken Plaintiffs to the possibility of the wrongful transfer of the funds out of Arctic's control.  By the time the checks were produced Plaintiffs had attempted to gain discovery on Arctic's treatment of the maintenance funds, including whether they had been transferred, but the Magistrate Judge's orders allowed Arctic to refrain from responding.  The stay in the Arctic proceedings was not lifted until after the relevant statute of limitations cutoff.

The information Plaintiffs' gained from the Badgers, or the Abel-Durst lawsuit, would not have prompted a reasonable plaintiff to do anything beyond what Plaintiffs attempted with their discovery requests.  Comerica argues that Plaintiffs should have sued a placeholder bank, or otherwise reserved the right to sue an additional defendant.  Plaintiffs certainly could have done that, as they have done in other cases, but Comerica has not produced sufficient evidence of events or information suggestive of wrongdoing which would have *required* Plaintiffs to amend their Complaint to secure their claims against foreseeable additional defendants.

In conclusion, the Court holds that while Plaintiffs should have known that Comerica was Arctic's banker earlier than 2003, and could have sued or subpoenaed Comerica earlier than

2003, under the unique circumstances of this case there was no reasonable diligence Plaintiffs should have undertaken, but failed to, which would have revealed the lending arrangement between Arctic and Comerica prior to the statutory cutoff date of January 16, 2000.   The Court therefore finds in favor of the Plaintiffs.

## V. DAMAGES

Plaintiffs' base damages amount has already been established in the prior settlement between Arctic and Plaintiffs, and was reaffirmed by the Court in its post-trial Order on Defendant's Proffer Related to Damages.  *See Owner-Operator Indep. Drivers Ass'n v. Comerica Bank*, No. 05-CV-0056, 2011 U.S. Dist. LEXIS 138216 (S.D. Ohio Dec. 1, 2011). That amount is **$5,583,084.00**, comprised of the total maintenance escrows awarded to the Class of $4,070,190, and the total interest awarded at the time of the original settlement of $1,512,894.

## VI. ATTORNEY'S FEES

Plaintiffs, as the prevailing party, are entitled to submit a timely petition for attorney's fees and expenses pursuant to Fed. R. Civ. P. § 54(d).  *See In re Sulzer Hip Prosthesis and Knee Prosthesis Liability Litigation*, 268 F. Supp. 2d 907, 921 (N.D. Ohio 2003) (finding the prevailing class counsel entitled to reasonable attorney's fees) (relying on *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

## VII. CONCLUSION

For the reasons stated herein, the Court enters **JUDGMENT** for Plaintiffs, and **AWARDS** the Class restitution in the amount of **$5,583,084.00**.

**IT IS SO ORDERED.**

                                    **  s/Algenon L. Marbley**
                                    **ALGENON L. MARBLEY**
                                    **UNITED STATES DISTRICT JUDGE**

**DATED:  March 20, 2012**